SAUNDERS BURGESS, PLAINTIFF IN ERROR, *v.* JOHN M. GRAY, THOMAS BURGESS, JR., AARON BURGESS, SIMEON BURGESS, JAMES BURGESS, JR., SAMUEL T. NORTHCUT, *alias* NORTHCRAFT, SILAS HUSKY, AARON A. SMIRL, GEORGE ARNOLD, AUSTIN M. JOHNSTON, GEORGE W. OGDEN, JOHN C. HARRINGTON, JOHN WATSON, LEWIS BUSH, AND JAMES G. CROMMIE.

No equitable and inchoate title to land in Missouri, arising under the treaty with France, can be tried in the State Court.

·The Act of Congress, passed on the 2d of March, 1807, (2 St. at Large, 440,) did not *proprio vigore* vest the legal title in any claimants; for it required the favorable decision of the Commissioner, and then a patent before the title was complete.

The Act of 12th April, 1814, (3 St. at Large, 121,) confirmed those claims only which had been rejected by the Recorder upon the ground that the land was not inhabited by the claimant on the 20th of December, 1803.

Where it did not appear by the report of the Recorder that a claim was rejected upon this specific ground, this act did not confirm it.

The question whether or not the Recorder committed an error in point of fact, was not open in the State Court of Missouri upon a trial of the legal title.

The mere possession of the public land, without title, for any time, however long, will not enable a party to maintain a suit against any one who enters upon it; and more especially against a person who derives his title from the United States.

THIS case was brought up from the Supreme Court of· the State of Missouri, by a writ of error issued under the 25th section of·the Judiciary Act.

The facts of the case are stated in the opinion of the court.

It was argued by *Mr. Garland,* for the plaintiff in error, and by *Mr. Darby,* for the defendants in error. *Mr. Garland* laid down the three following propositions : —

*First Proposition.* This claim was confirmed by the 2d sect. of the act 3d of· March, 1807, which is in these words :

" That any person, or persons, and the legal representative ·of any person or persons, who, on the twentieth day of December, one thousand eight hundred and three, had, for ten consecutive years, prior to that day, been in possession of a tract of land not claimed by any other person, and not exceeding two thousand acres, and who were on that day residing in the territory of Orleans, or Louisiana, and had still possession of such tract of land, shall be confirmed in their titles to such tract of land : Provided, that no claim to a lead mine or salt spring shall be confirmed merely by virtue of this section : And provided also, that no more land shall be granted by virtue of this section than is actually claimed by the party, nor more than is contained within the acknowledged and ascertained boundaries of the tract claimed."

The Supreme Court of Missouri, commenting on this section

say: " The words which declare that a certain class of claims ' shall be confirmed,' are only a direction to the board of commissioners to confirm the claims which may be brought within the class of evidence produced before them, and by no means import a present confirmation, by direct action of Congress upon the claims."

Whether the words in this section are merely directory I will hereafter examine, but that this may import a present confirmation has been decided by this court. In Rutherford v. Greene's Heirs, 2 Wheat. 196, it is so decided. The Legislature of North Carolina had made a donation of land to General Nathaniel Greene, in these words : " Be it enacted that 25,000 acres of land shall be allotted for, and given to, Major-General Nathaniel Greene, his heirs and assigns, within the bounds of the lands reserved for the use of the army, to be laid off by the aforesaid commissioners."

On the part of the appellant it is contended, say the court, that these words give nothing; they are in the future, not in the present tense, and indicate an intention to give in future, but create no present obligation on the State, nor present interest in General Greene. The court thinks differently. The words are words of absolute donation, not, indeed, of any special land, but of 25,000 acres in the territory set apart for the officers and soldiers. . . . . . As the act was to be performed in future, the words directing it are necessarily in the future tense. — " Twenty-five thousand acres of land shall be allotted for, and given to, Major-General Nathaniel Greene." Given when ? The answer is unavoidable — when they shall be allotted. Given how ? Not by any further act, for it is not the practice of legislation to enact, that a law shall be passed by some future legislature, but given by force of this act. It has been said, that to make this an operative gift, the words " are hereby " should have been inserted before the word " given," so as to read, " shall be allotted for, and are hereby given to, &c." Were it even true that these words would make the gift more explicit, which it is not admitted, it surely cannot be necessary now to say that the validity of a legislative act depends, in no degree, on its containing the technical terms usual in a conveyance. Nothing can be more apparent than the intention of the legislature to order their commissioners to make the allotment and to give the land, when allotted, to General Greene. . . . . .

The allotment and survey marked out the land given by the act, and separated it from the general map liable to appropriation by others. The general gift of 25,000 acres lying in the territory reserved for the officers and soldiers of the line of North

Carolina, had now become a particular gift of 25,000 acres contained in this survey."

In the treaty with Spain ceding the Floridas, the 8th article says: "All the grants of land made before the 25th January, 1818, &c., shall be ratified and confirmed." The counterpart, in the Spanish language, rightly translated, reads thus : " Shall remain ratified and confirmed." This court, commenting on these words, in the United States v. Perchman, 7 Pet. 89, say : "Although the words, ' shall be ratified and confirmed,' are properly the words of contract, stipulating for some future legislative act, they are not necessarily so. ' They may import that they ' shall be ratified and confirmed ' by force of the instrument itself. When we observe that in the counterpart of the same treaty, executed at the same time, by the same parties, they are used in this sense, we think the construction proper, if not unavoidable."

Here are two important cases decided by this court, in which the words, "shall be given," and the words, "shall be confirmed," are construed into a present grant and confirmation, by force of the instrument itself.

Let us now see whether such is not the true construction of the statute before us. The Supreme Court of Missouri say that the words, " shall be confirmed," are only a direction to the board of commissioners. The act of 2d March, 1805, created a board of commissioners to decide on claims to land in Louisiana. The 1st and 2d sections prescribed the character of claims to be acted on, and the kind of evidence to be given in their support. The supplemental act of April 21st. 1806, modified the evidence to be given. The decision of the board amounted only to a recommendation to Congress. These statutes, and the restrictions in them, giving much dissatisfaction, Congress passed the 4th section of the act of March 3d, 1807, in which they conferred on the board of commissioners full powers to decide, according to the laws and established usages and customs of the French and Spanish governments, upon all claims to lands, where the claim is made by any persons who were, on the 20th of December, 1803, inhabitants of Louisiana, and for a tract not exceeding the quantity of acres contained in a league square, and which does not include either a lead mine, or salt springs; which decision, when in favor of the claimant, shall be final against the United States.

Here we see power conferred on the board to decide, according to the laws and established usages and customs of the French and Spanish governments. They were restricted to claims coming under those laws and usages, and what might be those laws and usages they had full power to determine.

Now the claims embraced in the second section of the same act, do not necessarily fall under this head; if they do, then the second section was superfluous; the board having full power, under the fourth section, to decide such claims as are described in the second. But that the subject-matter of the second section was not intended to be referred to the board, is made plain by the eighth section, which says that the commissioners shall report to the Secretary of the Treasury, their opinion on all the claims to land, which they shall not have finally confirmed by the fourth section of this act.

If the law had intended that they should act on claims in the second section, that section would have been included in the above clause, and it would read, " shall not have finally confirmed by the second and fourth section of this act." The report would be in these words: The commissioners would have confirmed such and such a claim, by virtue of the second section of the act of March, 1807, but for such and such defects. This was generally the style of their negative reports. But we see that the claims under the second section, were not subjects on which they were authorized to report adversely upon; of course they were not subjects on which they would act at all.

Again, the second section makes no allusion to the claims therein described, being recognized and valid by the laws and usages of the country; on the contrary, we are bound to infer that Congress did not consider them as so recognized, and therefore singled them out as the special objects of their bounty. There were but two classes of claims recognized by the Spanish; both were described by the first and second sections of the act of 2d of March, 1805. The first was some written evidence of title, a concession or warrant, or order of survey; the second was a mere verbal permission to occupy and cultivate, hence it was called a " Settlement Right."

Now, the claims in the second section cannot come under the head of " Settlement Rights." A settlement right could not exceed eight hundred arpens, and required inhabitation and cultivation to give it validity. The claims under the second section largely exceed the quantity in a settlement right, and only required proof of possession, which does not necessarily involve inhabitation or cultivation. Hence, I conclude that the subject-matter of the second section, was not intended to be referred to the Board of Commissioners for their action.

Let us now examine the second section in its own terms. If the claimant was an inhabitant of the territory at the change of government, and was still in possession at that time, if the tract claimed had acknowledged and ascertained boundaries, not exceeding two thousand acres and not adversely claimed,

his title shall be confirmed. If the second section stood by itself, no one would fail to construe these words into a present grant, being in all respects similar to the two cases above cited. If then, the words of the section are sufficient to create a present grant, it is a forced construction to prevent them from having that effect, and to throw the confirmation on the future decision of a Board of Commissioners for the reasons already given. *First,* if the board had power to act on the subject, the second section was superfluous. *Second,* the eighth section implies an exclusion of the second from the jurisdiction of the board. *Third,* the language of the second section, leads us to presume that the Legislature did not think that the claims therein embraced, were recognized by the Spanish laws and usages, or they would have left them to be decided by the commissioners under their general powers.

The proviso of the second section puts it beyond doubt, that the claims were intended to be confirmed by force of the act itself. The proviso says, that no claim to a lead mine or salt spring shall be confirmed merely by virtue of this section. The necessary inference is, that a tract of land, not containing a lead mine or salt spring, but in other respects complying with its terms, shall be confirmed merely by virtue of this section. It may be said, that this proviso was intended as an instruction to the Board of Commissioners; but the fourth section, which confers the powers on the board, and imposes limitations on them, has this very same prohibition. This affords us good evidence of the meaning of the Legislature. They did not intend under any circumstances to confirm a lead mine or a salt spring; therefore, in the second section, where they intended to confirm certain claims, merely by force of the section, they introduced a proviso exempting lead mines and salt springs from its operation; and in the fourth section, where full powers are given to the board to decide all French and Spanish claims, they introduced a claim imposing the same restriction on them, in regard to lead mines and salt springs. This is the only way, in which we can give an independent existence to the second section and preserve it from being a mere superfluity.

There is nothing in the words of the section, that necessarily requires further action on the part of the Legislature or its ministerial agents. All that the claimant would have to do, when his right is brought in question, is to show that he comes within the provisions of the statutes, just as the claimants of village lots under the act of the 13th June, 1812. He will have to establish his title by showing a tract, not exceeding two thousand acres, with defined and ascertained limits; proving uninterrupted possession for ten consecutive years; residence in the

province and possession at the time of the change of government. These facts would work a title in him, having relation back to the time of the passage of the act.

*Second Proposition.* The next statute on which we rely for a confirmation, is the second section of the act passed April 12, 1814, entitled "An act for the final adjustment of land titles in the State of Louisiana and Territory of Missouri."

(The argument of *Mr. Garland,* upon this proposition, is too long to be inserted.)

*Third Proposition.* If the court are not sat.sfied, that the claim of John Jarrott was confirmed by the acts we have been commenting on, there is another view of the case, to which I would now ask their attention.

By the facts set forth in the petition, and admitted to be true by the demurrer, it seems that Jarrott had been in possession of the land more than ten consecutive years prior to the 20th December, 1803; that it did not exceed in quantity two thousand acres, and that he was an inhabitant of the territory, and still in possession on that day. By the second section of the act 3d March, 1807, he was entitled to a confirmation from any tribunal authorized to act on the subject. The claim was presented to the Recorder of Land Titles, and by him rejected, it was reserved from sale by the act of 17th February, 1818, third section. It was afterwards surveyed and marked on the books of the Surveyor General and on the books of the Register, as reserved to fill the claim of John Jarrott. In 1824 an act was passed authorizing the representatives of certain French and Spanish claims to prosecute them before the District Court. Various other acts were subsequently passed on these claims which it is not necessary to mention. On the 17th June, 1844, an act was passed reviving for five years the act of 1824.

The claim of John Jarrott did not come within the purview of these statutes. The act of 26th May, 1824, gave jurisdiction to the District Court over claims to lands, "by virtue of any French or Spanish grant, concession, warrant or order of survey legally made, granted, or issued before the 10th day of March, 1804," by the proper authorities. Jarrott's claim was neither a grant, a concession, a warrant, or order of survey; it was founded on verbal permission only, and was called a settlement right; as such it was filed, and as such it was acted on by the Recorder. That it did not come under the jurisdiction of the court, is put beyond question by a comparison of other statutes on the same subject. On the 9th of July, 1832, an act was passed creating a Board of Commissioners "to examine all the unconfirmed claims to land in that State, (Missouri,) heretofore filed in the office of the Recorder according to law, founded upon any incomplete

5 *

grant, concession, warrant, or order of survey, issued by the authority of France or Spain, prior to the 10th day of March, 1804." It will be perceived that the class of claims embraced in this statute is precisely the same as that in the act of 1824, over which the District Court took cognizance. They were claims originating in a grant, concession, warrant, or order of survey. Donation or settlement claims were not embraced; accordingly Congress passed a supplemental act embracing those claims.

On the 2d of March, 1833, it was enacted that the provisions of the act of the 9th of July, 1832, shall be extended to, and embrace in its operations every claim to a donation of land in the State of Missouri, held in virtue of settlement and cultivation. This supplement shows the understanding of the Legislature, and proves that Jarrott's claim, which was a "donation-right," was not embraced by the act of 9th of July, 1832, and consequently not by the act of 26th May, 1824, giving jurisdiction to the court, to precisely the same class of claims.

Since writing the above, I have seen the opinion of this court in the case of the United States v. Rillieux, 14 Howard, 189, which fully sustains the conclusion that the District Court had no jurisdiction in this case.

After the act of 1818, reserving this tract from sale, there was no other statute operating on it till the supplemental act of March, 1833, extending the provisions of the act of 1832, to donation and settlement rights. It was made the duty of the Commissioners to examine all the unconfirmed claims heretofore filed in the office of the Recorder, to take additional testimony, if they thought proper, in regard to those claims, and then to class them so as to show, first, what claims, in their opinion, would in fact have been confirmed under former authorities, and, secondly, what claims, in their opinion, are destitute of merit. They were required to proceed, with or without any new application of the claimants, and to lay before the Commissioners of the General Land Office a report of the claims so classed, to be laid before Congress for their final decision upon the claims contained in the first class.

The third section then enacts, " that from and after the final report of the Recorder and Commissioners, the lands contained in the second class shall be subject to sale as other public lands, and the lands contained in the first class shall continue to be reserved from sale as heretofore, until the decision of Congress shall be made thereon." Jarrott's claim was not embraced in either class, it was not acted on at all. The law made it the duty of the Board to proceed without further application. The claim was regularly filed in the office of the Recorder; the Commissioners might take additional testimony if the case required it. The

representatives of Jarrott had nothing to do; they could only wait in silence the action of the board. Their claim was overlooked or not reached; the board made their final report, and dissolved. Now, it is a well settled principle of law that no person shall suffer in his rights in consequence of the delay or neglect of government officers. This tract of land stands reserved from sale, as heretofore, to fill the claim of John Jarrott's representatives.

In Menard v. Massey, 8 Howard, 309, this court have said: " That this provision (section 6th of act 3d March, 1811,) is an exception to the general powers conferred on the officers to sell, is not an open question; having been so adjudged by this court in the case of Stoddard's Heirs v. Chambers, reported in 2 Howard; and again, at the present term, in the case of Bissell v. Penrose. Nor is it an open question, that the act of February 17, 1818, folio 3, reënacts and continues in force the exception as respects such lands. This was also decided by the above cases; and that such was the opinion of Congress, is manifest from the third section of the act of 9th July, 1832, under which the last Board acted; for it declares that lands of the first class shall be reserved from sale as heretofore." Now it is manifest that lands not classed at all, not acted on by the Board, must continue reserved from sale as heretofore. We can come to no other conclusion without admitting that the neglect or delay of public officers can deprive a person of his rights, which is not consistent with law or justice.

The Supreme Court of Missouri, in a similar case, have held that the lands continue to be reserved as heretofore. In Perry v. O'Hanlon, 11 Mo. 596, they say: " What then was the condition of the land, the title to which is now in controversy, in 1847, when the patent issued? The act of July 9th, 1832, directed the Commissioners to divide the claims submitted to them into two classes. The first class was to embrace such claims as, in their opinion, were meritorious and ought to be confirmed; and the second class, to include such as were destitute of merit. The act declared that, after the final report of the Board, the lands embraced in the second class should be subject to sale as other public lands; that the lands contained in the first class should be reserved from sale until the final action of Congress thereon. Congress finally acted on this report in 1836; and the act, July 4, 1836, confirmed the claims recommended by the Commissioners, with certain exceptions specified in the act. Perry's claim was not in the second class, for it was never rejected by the Board; it was not in the first class, for it v not reported for confirmation. How then has the reservation been removed? By the act of 1832, this land was expressly

reserved from sale. No proceeding under that act has had the effect of taking off this reservation, nor has any subsequent law been enacted having such purpose or tendency. If Perry, then, by virtue of the proceedings under the proviso to the third section, failed to acquire a complete title to the land by purchase, it still continues under the general reservation. Whether Perry's title be good or otherwise, until Congress shall direct the land to be brought into market, no other individual can acquire a title. It was expressly reserved on account of Perry's claim under Valle. That reservation still remains."

"This tract of land, therefore, stands reserved from sale "as heretofore," and all the entries made upon it are consequently void. But the Supreme Court of Missouri tell us there is no remedy. ".Suppose it be true," say they, "that the reservation did exist, and that its effect would be to render the purchases void, still his position (plaintiff's) in court is not changed thereby. The reservation confers no title on him; and the nullity of purchases made by the defendants does not enhance the merits of his title. He is still without any title that we can enforce."

They came to this conclusion on the authority of cases decided by this court. "The Supreme Court of the United States," say they, in Les Bois v. Bramell, 4 Howard, 462, and in Menard v. Massey, 8 Howard, 307, "distinctly declare that until an inchoate title originating under the Spanish government has been ' confirmed,' it has no standing in a court of law or equity."

In the view I am now about to press upon the consideration of the court, I do not rest the case on the "unconfirmed title" filed in the Recorder's office. The above authorities, therefore, and the principle deduced from them, are inapplicable.

I maintain that we have a right to the aid of the court on the ground of possession; legal possession of a tract of land with acknowledged and ascertained boundaries, by permission and authority of the Congress of the United States. We are tenants of the government, and have a right to be protected in our possession.

The statute of Missouri says: "The action of ejectment may be maintained in all cases where the plaintiff is legally entitled to the possession of the premises."

In this case, Burgess, as representative of Jarrott, is legally entitled to the possession of the premises.

Kendall, who purchased of Jarrott's heirs, filed his claim with the Recorder under the seventh section of the act 13th June, 1812, which required him to be an actual settler on the land. As the claim was not confirmed on other grounds we are to presume

that he complied with the law in this respect, and was an actual settler. We know, from the record, he was. The land thus actually settled was reserved from sale by a subsequent act of Congress. It was surveyed and marked on the book of surveys, in the Register's office, as reserved from sale, to fill the claim of John Jarrott's representative. This representative was in the actual occupation and use of the land. Here, then, is a specific tract of land in the actual occupation of Kendall, who has authority by law to hold the same until Congress shall determine whether or not he has a right to demand a legal title for it. Until that event he has possession, and a legal right to the possession.

Burgess, in his petition, sets out his possession and the ouster of possession by the defendants. After describing the chain of events, and proving himself the legal representative of John Jarrott, the petition then proceeds: "And your petitioner has been in possession of six hundred and forty acres of said land ever since he purchased it as aforesaid."

The petition goes on to show that the land was marked on the books as reserved from sale, and was reserved from sale to fill the claim of Jarrott's representatives, "until the 30th day of December, 1847, a period of twenty-nine or thirty years, when, in violation of law, the several acts of the Congress of the United States, and the rights of the legal representatives of the said Jarrott," the Register suffered preemptions to be taken on it; "and the persons who took said preemptions had full knowledge at the time of the claim of John Jarrott's legal representatives to said land, and now having possession of said land, and claiming the same as their property, (although attempted to be unlawfully obtained,) and are keeping the legal representatives of the said Jarrott out of their possession of the same, notwithstanding it is their property, and belongs to no other person whatever." And, in conclusion, the petition prays "that said defendants be, by verdict and judgment in your petitioner's behalf, compelled to abandon their illegal claim to said land or any part of it: to wit, your petitioner's six hundred and forty acres of it."

This petition is awkwardly worded, but the statute of Missouri requires no particular form, only that the petitioner shall set out his case in full, and in language so that a man of common understanding shall know what is meant. There can be no mistake as to the meaning of this petition. Burgess had bought six hundred and forty acres of this land by deed, and was in the actual possession of the same, according to the metes and bounds of his deed, when the defendants intruded and unlawfully obtained possession, and are holding the same against the lawful possession of him, the legal representative of John

Jarrott, and he prays that they may be adjudged to surrender up this unlawful claim to his land.

It is on this right of possession we now ask the judgment of the court.

That the entries are void, cannot be questioned. See Stoddard's Heirs *v.* Chambers, 2 Howard 284; Menard *v.* Massey, and Bissell *v.* Penrose, 8 Howard; and Perry *v.* O'Hanlon, 11 Missouri, 585. The entries being void, our right of possession will be recognized and enforced.

The political power has acted on this claim, and it is now cognizable by the courts of law. The claim was required by statute to be filed with the Recorder of Land Titles; to be investigated and reported to Congress. Another statute declares that until the final action of Congress thereon it shall be reserved from sale. The executive officers are instructed to carry these laws into effect. The Surveyor-General marks it out on the maps in his office; draws lines around the claim, and writes on the face of it, ".Reserved from sale, to fill the claim of John Jarrott's representatives." Will not the courts recognize a claim in this condition, and enforce the law in regard to it? They do not look upon it as an unconfirmed Spanish grant, having no standing in a court, but as a claim filed and reserved from sale by the laws of Congress: it has a legal existence. They enforce the laws of Congress and say: The possession of Jarrott's representatives is recognized by statute, and is valid until the final action of Congress: in the mean time all entries on this land are without authority and void. The Supreme Court of Missouri admit that they have power to pronounce the entry of the defendants void, because the land is reserved from sale by a law of Congress; but deny that they can go further, and protect the right of possession in the plaintiff, because he sets up nothing more than an unconfirmed Spanish grant which is not recognized by law. But he does more, he sets up a right of possession in this land under the law of Congress. It is admitted that the plaintiff is in possession, and has been from the beginning. It must also be conceded that the reservation was made in respect of this possession, because every law on the subject of incomplete Spanish grants is based on the idea of actual possession or inhabitation and cultivation. This reasoning is specially applicable to the present case, because it has no written evidence of title, and rests entirely on actual settlement or possession. Here then is a claim founded in possession, only, recognized by law. If, therefore, the courts can protect the reservation by declaring all entries on it, subsequent to the reservation, void, they can likewise protect and enforce the right of possession on which the reservation was founded. The same

law that gives them power to protect the reservation, gives them power to protect the possession under it. If this be not so, then a *bonâ fide* holder of land under the authority of Congress can be ousted of his possession, and the courts have no power to protect him. But this is not law. An ejectment can be maintained on a bare possession against a trespasser. In the case of Crockett *v.* Morrison, 11 Mo. page 6, the court say: "As the action of ejectment is a possessory action, where no title appears on either side, a prior possession, though short of twenty years, will prevail over a subsequent possession which has not ripened into a title, provided the prior possession be under a claim of right and not voluntarily abandoned. . . . . . . This doctrine is recognized by the New York courts in a variety of cases. . . . . . . In all these cases it will be found that the defendants, against whom a recovery was permitted, were mere trespassers, and that they, or those under whom they claimed, or from whom they obtained possession, entered upon the actual or constructive possession of the plaintiff."

In the present case there is no question of title: that remains in the United States. The Supreme Court of Missouri admit that Burgess is in possession, and that the entry of the defendants is void. Then the defendants are mere trespassers on the actual and constructive possession of the plaintiff, and ought to be ejected by the present action.

*Mr. Darby,* for defendants in error.

The petition of the plaintiff shows that he has no title. His claim is not based upon a concession, and was never confirmed. The only action ever taken with the claim by the parties purporting to represent it, was when it was presented to the Recorder of Land Titles, by Kendall, after his purchase in 1812. The Recorder refused to recommend it for confirmation, and rejected it; and from that time to the commencement of this suit, a period of nearly forty years, the claim appears to have been abandoned. At least, no steps appear to have been taken to bring it before the Recorder, or any of the several boards of commissioners, for confirmation. It does not appear to have been presented to Congress, or any department of the government or other tribunal, for their sanction, approval, or confirmation.

The opinion of the Supreme Court of Missouri has shown, most conclusively, that it was not confirmed by the second section of the act of the 3d of March, 1807, (2 U. S. Stat. at Large, 440,) as was contended by the counsel in that court, in the argument of this cause.

The plaintiff, then, has nothing more than an unconfirmed,

unprosecuted claim to land, which has been rejected by the Recorder of Land Titles, and that rejection acquiesced in for nearly forty years; and which the defendants, as shown by the plaintiff's petition, have purchased, at different times, of the United States, and to which they have severally a title from the government. It is manifest the plaintiff has no such title as will authorize a court of justice to give him the relief prayed for in his petition.

The claim was not filed under the provisions of the act of Congress of May 26, 1824, giving jurisdiction to the District Court of the United States for the Missouri District, to adjudicate and pass on these unconfirmed claims. The claim was consequently barred. The fifth section of that act provides, " That any claim not brought before the District Court within two years from the passing thereof, shall be forever barred, both in law and equity; and that no other action at common law, or proceeding in equity, shall ever thereafter be sustained in relation to said claim."

In further support of this position, the defendants refer to the case of Barry *v.* Gamble, 3 How. 55, and also to the case of Chouteau *v.* Eckhart, 2 How. 352.

To show, moreover, that the plaintiff's claim has " no standing in a court of law or equity," the defendants rely with much confidence on the case of Les Bois *v.* Bramell, decided in this court at the January term, 1846, 4 How. 462. And in the case of Menard *v.* Massy, 8 How. 307, the same principle is still more strongly asserted and adhered to.

The decision of the Supreme Court of Missouri is made in accordance with the decisions referred to, and is governed by them. The demurrers were rightfully sustained on both points.

The defendants were improperly joined in the action. They held separately, each in his own right, under entries made at the Land office at different times, and under preëmptions allowed in favor of each of the defendants. The petition shows that they did not hold or claim title in common, but that they held separately.

In conclusion, the defendants adopt, as a part of their argument, a portion of the able opinion of Chief Justice Gamble, in delivering the opinion in this cause :

" The plaintiff, then, has no title which authorizes him to ask the relief prayed for in this petition. But he alleges that the land was, by different acts of Congress, reserved from sale in order to satisfy his claim, and therefore the purchases made by the defendants were void. Suppose it to be true that the reservation did exist, and that its effect would be to render the purchases void, still his position in court is not changed there-

by. The reservation confers no title on him, and the nullity of purchases made by the defendants does not enhance the merits of his title. He is still without any title that he can enforce."

Mr. Chief Justice TANEY delivered the opinion of the court.

This was a suit brought by petition in the Circuit Court of Jefferson county, in the State of Missouri, by the plaintiff in error, against the defendants.

" The petition sets forth, in substance, that John Jarrott, *alias* Gerrard, in 1780, with the consent and permission of the officers of the Spanish government, settled upon a tract of land in what is now Jefferson county, in the State of Missouri, and that he continued to inhabit and cultivate it until about 1796, when he was driven off by the Indians. His son Joseph succeeded him in the possession of the land, and continued to reside upon and cultivate it until he sold it to Kendall, in the year 1812. Kendall filed a notice of the claim with the United States Recorder of Land Titles, who rejected it. The right of Kendall passed by descent to his heirs at law, who sold to the plaintiff, as appears by conveyances filed with the petition. It appears, moreover, that the plaintiff has always been in possession since the purchase of Kendall's heirs. A plat of the claim was laid down on the maps of the public lands, in the Registrar's office, representing it as being reserved to satisfy the claim of John Jarrott's legal representatives. After the claim had been examined and rejected by the Recorder of Land Titles, no farther action appears to have been taken on the claim.

" In the years 1847 – 8, and 9, different portions of the same tract of land were entered at the Registrar's office, by different individuals, under preëmptions allowed to them; the entries being made at different times, each person purchasing in his own right and in his own individual name, separate and distinct from the others. The several persons making these separate and different entries are made the defendants to this suit.

" The defendants demurred to the petition, and assigned as causes of demurrer : first, that the plaintiff showed no right, in his petition, to maintain the action; second, that separate and distinct causes of action against different persons were joined in the petition.

" The Circuit Court of Jefferson County, sustained the demurrers, and the plaintiff appealed to the Supreme Court of of Missouri. The Supreme Court affirmed the decision of the Circuit Court, and the plaintiff has brought his case before this court, by writ of error, to reverse the decision of the Supreme Court of Missouri."

In proceeding to deliver the opinion of the court, it is proper to observe, that by the laws of Missouri the distinction between suits at law and in equity has been abolished. The party proceeds by petition, stating fully the facts on which he relies, if he seeks to recover possession of land to which he claims a perfect legal title ; and he proceeds in the same manner if he desires to obtain an injunction to quiet him in his possession, or to compel the adverse party to deliver up to be cancelled evidences of title, improperly and illegally obtained, and he may, it seems, assert both legal and equitable rights in the same proceeding, and obtain the appropriate judgment.

This has been done by the plaintiff in error in the present case. His suit is brought according to the prayer of his petition to recover possession of land to which he claims title, and upon which, as he alleges, the defendants have unlawfully entered; and also to compel them to abandon (as he terms it) their illegal claim.

The demurrer admits the truth of the facts stated in the petition. And, consequently, if these facts show that he had any legal or equitable right to the land in question under the treaty with France, or an act of Congress, which the State court was authorized and bound to protect and enforce, he is entitled to maintain this writ of error, and the judgment of the State court must be reversed.

Now as regards any equitable and inchoate title which the petitioner may possess under the treaty with France, it is quite clear that the State court had no jurisdiction over it. For it has been repeatedly held by this court that, under that treaty, no inchoate and imperfect title derived from the French or Spanish authorities can be maintained in a court of justice, unless jurisdiction to try and decide it has first been conferred by act of Congress. Certainly no such jurisdiction has been given to any State court. And the Supreme Court of Missouri were right in sustaining the demurrer, as to this part of the petition, even if it had been of opinion, that the permit to settle on the land, and the long possession of it under the Spanish government, gave him an equitable right, by the laws of Spain, to demand a perfect and legal title. The court had no jurisdiction upon the question. And the judgment of the State court cannot be reversed unless the plaintiff can show that he had a complete and perfect title derived from the Spanish or French authorities : or a legal or equitable title under the laws of the United States.

The petitioner does not claim a perfect grant from the French or Spanish government; nor a patent from the proper officers of the United States. But he insists that the act of Congress of March 3, 1807, 2d Stat. 440, vested in him a complete legal title, and needed no patent to confirm it.

Undoubtedly Congress may, if it thinks proper, grant a title in that form, and it has repeatedly done so. And we proceed to examine whether the title, claimed by the plaintiff, was confirmed to him by the act referred to.

The plaintiff relies on the second section as a confirmation of his claim. But it evidently will not bear that construction when taken in connection with the whole act. For the fourth section directed commissioners to be appointed, who were authorized to decide upon all claims to land under French or Spanish titles in the territories of Louisiana or Orleans; and by the sixth section, whenever the final decision of the Commissioner was in favor of the claimant, he was entitled to a patent for the land, to be issued in the manner provided for in that section. The eighth section required the Commissioners to report to the Secretary of the Treasury their opinion upon all claims not finally confirmed by them — the claims to be classified in the manner therein prescribed. And it was made the duty of the Secretary to lay this report before Congress for their final determination.

This act of Congress did not, *proprio vigore* vest the legal title in any of the claimants. For even when the decision of the Commissioners was final in their favor, yet a patent was still necessary to convey the title. The report was made conclusive evidence of the equitable right, and nothing more. And when the final decision was against the validity of the claim, he was directed to report his opinion upon its merits; and Congress reserved to itself the ultimate determination.

The powers and duties of the Commissioner were subsequently transferred to the Recorder of Land Titles. And this claim was presented to him in 1812, with the evidence upon which the claimant relied to support it. It is a claim under a settlement right derived from the Spanish authorities, and which the claimant insisted was within the provisions, and entitled to confirmation under the second section of the act of 1807.

The Recorder reported against it. His report states that there was " possession, inhabitation, and cultivation in 1781, and eight following years, and again two or three years." He assigns no particular reason for rejecting the claim, but simply enters in his report " not granted." And in this form it was laid before Congress, together with the other claims not finally decided by the Recorder in favor of the claimants. It does not therefore appear from the report whether it was rejected because, in the judgment of the Recorder, the possession of ten consecutive years was not sufficiently proved: or because no evidence was offered (and none appears to have been offered) to prove that the party under whose title the claim was made was a resident of the territory on the 20th of December, 1803.

On behalf of the petitioner it is contended, that the decision of the Recorder was erroneous, and founded upon a mistake as to a matter of fact; and that it appears by the evidence returned with the report to the Secretary of the Treasury, that the possession spoken of was proved to have been for more than ten consecutive years before the 20th of December, 1803 — and no: broken, as stated in the report.

This may be true.   The Recorder may have fallen into error. But it does not follow that plaintiff was entitled, on that account, to maintain his petition in the Missouri court.   That court had no power to correct the errors of the Recorder if he made any; nor to revise his decision; nor to confirm a title which he had rejected.  That power, by the act of 1807, was expressly reserved to Congress itself; and has not been committed even to the judicial tribunals of the general government.   The decision of the Recorder against him is final, unless reversed by act of Congress; and the petitioner can make no title under the United States, by virtue of the provisions in that act.

It is however insisted that if it was not confirmed by the act of 1807, it was made valid by the act of 1814.   And this confirmation is claimed under the first section, which confirms all claims where it appears by the report of the Recorder that it was rejected merely because the land was not inhabited by the claimant on the 20th of December, 1803.

But it is very clear that this act does not embrace it.  The report of the Recorder does not place its rejection merely on that ground.   On the contrary, it would seem to place it upon the want of proof of continued residence upon the land for ten consecutive years; and upon none other.

It may indeed have happened that the son of John Jarrett was in possession, and actually inhabited the land on the day mentioned in the law; and that from ignorance of its provisions, or from other cause, he omitted to produce proof of it to the Recorder, and that the claim was in fact rejected on that account.   But that question was not open to inquiry in the Missouri court.   The act of Congress does not confirm all claims where this fact existed and could be proved, but those only in which it appeared on the face of the report that the want of this proof was the sole cause of its rejection.   This must appear on the written report of the Recorder to bring it within the provisions of this act, and cannot be supplied by other evidence. And as it does not so appear in the present case, the act of 1814 does not embrace it nor confirm it.

Neither can the petition be maintained upon the long and continued possession held by the petitioner and those under whom he claims.

The legal title to this land, under the treaty with France, was

in the United States. The defendants are in possession, claiming title from the United States, and with evidences of title derived from the proper officers of the government. It is not necessary to inquire whether the title claimed by them is valid or not. The petitioner, as appears by the case he presents in his petition, has no title of any description derived from the constituted authorities of the United States, of which any court of justice can take cognizance. And the mere possession of public land, without title, will not enable the party to maintain a suit against any one who enters on it; and more especially he cannot maintain it against persons holding possession under title derived from the proper officers of the government. He must first show a right in himself, before he can call into question the validity of theirs.

Whatever equity, therefore, the plaintiff may be supposed to have, it is for the consideration and decision of Congress, and not for the courts. If he has suffered injury from the mistake or omission of the public officer, or from his own ignorance of the law, the power to repair it rests with the political department of the government, and not the judicial. It is expressly reserved to the former by the act of Congress.

We see no error in the judgment of the Supreme Court of Missouri, and it must be affirmed with costs.

### Order.

This cause came on to be heard on the transcript of the record from the Supreme Court of the State of Missouri, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said Supreme Court in this cause be, and the same is, hereby affirmed with costs.