State ex rel L. C. CALDWELL v. JAMES W. WILSON.

*Quo Warranto—Railroad Commission—Suspension of Commissioner by Governor—Statute, Constitutionality of—Due Process of Law—Equal Protection of Laws—Right to Trial by Jury—Officer—Acceptance of Office Subject to Provision of Act Creating it.*

1. The office of Railroad Commissioner, established by Chapter 320, Acts of 1891, exists solely under the Constitution and laws of this State and was created to administer the Railroad Commission Act and, having no recognition in the laws of the United States and being concerned solely in domestic affairs and trade, does not interfere with inter-state commerce.

2. The object of a summons being to bring the defendant into Court by giving him legal notice, his voluntary appearance, without limiting his appearance, is a waiver of a summons and he is as completely in Court as if he had been served therewith.

3. Where a Railroad Commissioner, holding office under a Statute which makes it the duty of the Governor of the State to suspend him until the next meeting of the General Assembly in case he becomes subject to the disqualifications prescribed in the Statute, is cited by the Governor in writing to appear and answer certain charges recited in the notice as to his disqualification and, in response thereto, appears

121—54

or files an answer, such notice is, in effect, a citation and such appearance in person or by answer filed gives complete jurisdiction to the Governor and the consequent action of the Governor in suspending such Commissioner from office, followed by a notification of the suspension and an appointment of his successor, is "due process of law."

4  "Due process" is such process as is due to the particular circumstances of a case according to the law of the land.  It does not necessarily imply a regular proceeding in a Court of justice or after the manner of such Courts, and a party cannot be said to have been deprived of his property "without due process" when he has had a fair hearing according to the modes of proceeding applicable to such case.

5. A trial by jury in suits at common law pending in the State Courts is not a privilege or immunity of national citizenship which the States are forbidden by the Fourteenth Amendment to abridge, and the requirement of the Federal Constitution that no person shall be deprived of his property without due process of law does not imply that all trials in the State Courts affecting property must be by jury, but it is met if the trial be had according to the settled course of Judicial proceedings.

6. It is competent for the Legislature, in creating an office, other than purely judicial, to reserve to itself the right to remove, or to the Governor the right to suspend, the incumbent of the office.

7. The provision of the Railroad Commission Act, (Chapter 320, Acts of 1891) empowering the Governor, in certain contingencies, to suspend a Commissioner whose office is created by the Act, does not interfere with any vested right, but "prescribes" a rule of property in the office and modifies the extent of interest and tenure therein "prospectively," and one taking the office holds it subject to and is bound by all the provisions of the Act.

8. The Railroad Commission established by Chapter 320, Acts of 1891, is purely of legislative origin and is an *administrative* and not a *judicial* Court, and though, by subsequent Statute. the Commission was made a Court of Record, the object and effect of such amending Statute was simply to give authenticity to its records and proceedings and added nothing to its duties and powers.

9. A Statute creating a Railroad Commission, which prescribes that the Commissioners shall not be or become interested in any wise in any railroad, &c., is not unconstitutional because the qualifications required are in addition to those prescribed by the Constitution, such provisions being intended not to restrict the rights of the individual but to secure the faithful and efficient performance of public duties.

10. Section 1 of Chapter 320, Acts of 1891 (Railroad Commission Act) pre-
scribes that, if either of the Commissioners whose election is provid-
ed for by such Act, shall be or become interested in any wise in any
railroad company, &c.. it shall be the duty of the Governor to sus-
pend him from office until the next meeting of the General Assem-
bly by a majority of which, in joint session, the question of his re-
moval shall be determined. *Held,*

(1) That the power of suspension rests in the hands of the Governor
and its exercise in an orderly manner is not reviewable by the
Courts.

(2) That the exercise of such power of suspension, after the appear-
ance and answer of a commissioner in response to a citation setting
forth the charges of disqualification, is due process of law and not
a violation of the fourteenth amendment to the Constitution of
the United States.

(3) That such Act does not interfere with the independent tenure of
the judiciary, the Commission being an administrative and not a
judicial Court.

(4) That whatever right to a trial by jury the incumbent so charged
might have had was waived by his acceptance of the office under
the conditions of the Statute, so far as the action of the Governor
is concerned.

ACTION in the nature of *quo warranto* tried before *Coble, J.,*
at November Term, 1897, of IREDELL Superior Court, on
complaint and answer.

The complaint was as follows:

"The plaintiff complains and alleges—

1st.   That the relator, L. C. Caldwell, is a citizen and
tax-payer of Iredell County, North Carolina.

2nd.   That the defendant was duly elected Railroad Com-
missioner by the Legislature of 1893 for the term of six years
from the time of his election until expiration of his term.

3rd.   That, as the relator is informed and believes, on
the 24th day of August, 1897, his Excellency Daniel L.
Russell, Governor of North Carolina, addressed and sent to
the defendant, James W. Wilson, a communication in the
following words and figures, to-wit:

STATE OF NORTH CAROLINA,
EXECUTIVE DEPARTMENT,
RALEIGH, Aug. 24, 1897.

*To* JAMES W. WILSON, ESQ., *Member of the*
*Railroad Commission of North Carolina:*

SIR:—By section first of the Railroad Commission Act, ratified the 5th day of March, 1891, it is made the duty of the Governor to suspend from office any Railroad Commissioner who shall be the holder of "any stock or bond of any railroad company, or be the agent or employee of any such company, or have any interest in any way in such company, or in case any one of them shall be disqualified to act." It is alleged that you are the joint owner, with Col. A. B. Andrews, the first vice-president of the Southern Railroad, general political manager of the same for North Carolina, of a certain piece of hotel property known as Round Knob, situated on the line of the said railroad; that said hotel property is worth little or nothing except as a hotel and that it is worthless for this purpose except when designated and patronized by the Southern Railroad as an eating-house for their passenger trains; that said hotel property has been unoccupied and unused for any purpose for several years past and has brought in no revenue to you as one of its owners; that it is impossible for you to use, rent or lease said property unless some understanding, agreement or contract could be made with the Southern Railroad Company to designate and patronize the said hotel as a railroad eating-house; that you and the other owner or owners of said · hotel property have secured some agreement, understanding or contract from the Southern Railroad Company to abandon other eating-houses and designate Round Knob as an eating-house; and that, by virtue of said arrangements with said railroad, you have been able to lease said hotel property to S.

Otho Wilson, or to his mother through the said Wilson, for profit.

It is further alleged that you have a son in the employment of the Southern Railroad Company at Morganton; that he was appointed to this place by the Southern Railroad Company at your request, and that he was appointed over others entitled to the place by promotion under the practice of the company, and that this was done for your accommodation and at your request.

These allegations have been made to me by many persons, and I think publication of them has been made in the public press. If they or the material substance of them be true —as to which I am expressing no opinion—then the questions to be determined are as follows:

*First.* Have you acquired any interest in any way in such company in violation of law ?

*Second.* Have you become disqualified to act as a fair judge or commissioner ?

Under the law, the Governor has not only a right but is required to suspend a railroad commissioner who commits a breach of the Statute, which has been cited, and this he may do, as in other cases of executive removals, without notice to the party interested; but I shall not pass judgment or decide this matter until you have had a full opportunity to be heard by way of denial or explanation or justification or other defence. You will therefore please show cause in writing on or before Wednesday, the 1st day of September, 1897, at the Executive office in Raleigh, why you should not be suspended from your said office and a report thereof made to the next General Assembly according to law. On the return day of this notice, you will please make answer and proofs in writing, and be there in person, or by counsel, at your election.                    DANIEL L. RUSSELL,
                                                        *Governor.*

To which said James W. Wilson in obedience to said order made reply as follows:

AUGUST 30TH, 1897.

To DANIEL L. RUSSELL,
        *Governor of North Carolina:*

SIR:—Your favor of the 25th, citing me to appear before you on Wednesday, the 1st day of September, and reply in writing to certain rumors or charges from parties unknown to me, and show cause why I should not be removed from the responsible position of chairman of the railroad commission, agreeable to Section 1 of the Act creating this commission, was duly received.

In obedience thereto I herewith submit this, my answer to each charge in the order as given in your letter. It is drawn by myself, and possibly free from the elegant diction which a lawyer would have imparted, but I feel sure it will carry conviction to an impartial mind.

1st. It is not true, as alleged, that I am the joint owner with Col. A. B. Andrews, vice-president of the Southern Railway and general political manager of the same for North Carolina, in a certain piece of hotel property known as Round Knob.

2nd. It is not true that said hotel property is worthless for that purpose except when designated and patronized by the Southern Railway Company as an eating-house for their passenger trains.

3rd. It is not true that said hotel property has been unoccupied and unused for any purpose for several years past and brought in no revenue to me as one of its owners.

4th. It is not true that it was impossible to use, lease or rent said property unless some understanding, agreement or contract could be made with the Southern Railway to designate and patronize the said hotel as a railroad eating-house.

5th. It is not true, as alleged that I with the other owner or owners of said property have secured an agreement, understanding or contract from the Southern Railway Company to abandon other eating-houses and designate Round Knob as an eating-house, and by virtue of said agreements with said railroad that I have been able to lease said hotel property to Otho Wilson, or his mother, through the said Wilson, for profit.

6th. It is untrue, as further alleged, that I have a son in the employment of the Southern Railway Company at my request and that he was appointed over others entitled to the place by promotion under the practice of the company, and this was done for my accommodation and at my request. I hereby denounce these allegations as made to you by many persons as false, and demand the proof.

In explanation I will say that, about 1881, Col. Andrews and myself built this hotel at a cost of about $8,000. It is not worthless, as stated, but is a most convenient and beautiful hotel, with thirty rooms, closets and baths on each floor, and was leased and run as a hotel for several years with no meals supplied to passengers. The property has not been unoccupied for years, as charged, but on the contrary was leased up to last year, at an annual rental of $500 per annum, to a responsible party, with no understanding of any kind with the Southern Railway Company.

In a casual conversation with Mr. Otho Wilson, my recollection is that I spoke of this very desirable property, which was then vacant, the lease of Friscard & Co., having expired, and saying that the superintendent of the road had sent me word that if some one would open and keep a good house he would make it a dinner house; the hotel at Hickory was then closed, and my impression is that Asheville was not then a regular eating-house, but of this I am not sure. Mr. Wilson remarked that his mother was looking around for a

boarding house, and that possibly this might suit her, and he would go up and examine the property. This he did, and on his return expressed himself as greatly pleased, but said the former lessee had left the property in bad condition and very dirty. I was aware of this, and replied that, on this account, if his mother would put the place in good repair she could have it the first year free of rent—this much for the profit as charged; the message to me about the eating-house was not intended for Mr. Otho Wilson or his mother, but was sent before Mr. Wilson or his mother ever thought of it, or intended for any person I could get who would keep a first-class table. The management of the property was left entirely to me, and my recollection is that I never mentioned the matter to Col. Andrews until the trade was consummated through Mr. Otho Wilson for his mother.

The land upon which the Round Knob property was located belonged to John Malone, Col. Crockford and myself. This party owed a debt of about $3,000 to R. H. Brown, of McDowell County, I am the only one of the parties now living, and was alone responsible for the debt. For the hotel itself I paid $6,000, Col. Andrews $3,000, Col. Andrews' interest being about one-quarter of the hotel, with about ten acres of land adjoining. Before the receipt of your letter I had no idea that any man in North Carolina seriously considered that my owning a piece of property jointly with Col. Andrews, and held jointly by us since 1881, and now rented by a widow, which being in addition to a summer resort was a dinner station for the passenger trains of the Southern Railway, would ever in any way be so construed as to make me in any form under obligations to the Southern Railway.

Finding, however, by your letter that there were parties who believed or pretended to believe that this was indirectly a violation of the Act, I promptly, under the advice of friends,

to avoid "even the appearance of evil," deeded my individual interests in the property to R. H. Brown for his claim of about $3,000, about the value, at the present depreciation, of the property. This was done agreeably to Section 1 of the Act to avoid any criticism by even the captious as to my conduct as Railroad Commissioner, feeling no uneasiness that your fairness as a judge should be so biased as to decide that with the showing made you could, with any pretention of justice, remove me from the office now held by the unanimous support of the Legislature of North Carolina; for this unprecedented compliment I have never before had an opportunity to return thanks.

As to the charges about my son, I will say that he is no minor, as charged, but is twenty-seven years old, and is one of the oldest employees on the division upon which he is stationed. About seven years ago the agent at Morganton resigned. My son was his chief clerk, and in the very line of promotion. V. E. McBee, general superintendent of the Seaboard Air Line, was at that time superintendent of that division; he had previously promised my son, as was told, that he would promote him at the first opportunity. Mr. McBee kept his promise. I have no recollection of it, but it is more than probable that I spoke to Capt. McBee in his behalf. It would have been a most unnatural father who would have done otherwise. I believe this covers the entire bill of charges. But there are other matters of rumor, not in your letter, but calculated to prejudice your mind. I consider it but simple justice to state the facts as to each one. It is charged that, when the Seaboard system was endeavoring to give the people cheap rates, I interfered. The following is a copy of orders in the case. See report of the Commissioners to the Governor, page 213: "It appears from press reports that reduced rates have been again ordered to be put

121—55

in effect from certain points outside of this State to certain points within, clearly causing a discrimination in violation of the long and short haul clause of the Act creating the Commission. Justice to the local business of the State requires us to take prompt action. It is therefore ordered by the Commission that all roads doing business in the State of North Carolina shall reduce their local tariffs to passenger and freight in the same proportion as has been done by them on their through business."

It was my opinion then that our own folks should have at least as good treatment as outsiders. I drew the order and would do so again under similar circumstances. It is also charged on the streets that the Seaboard system was unfairly dealt with by me in the matter of their proposed change of line at Gaston. The facts are, that the order as given was drawn by Capt. McBee, General Superintendent of the Seaboard Air Line, and in his own writing in this office. By his request, the board adopted it as their order, believing it to be a fair solution of the matter. At least, the Seaboard should be estopped from objecting. The charges as made against me are, in my opinion, so frivolous that they would have been passed unnoticed had they not been considered as of serious importance by one who holds the exalted position that you do. It is also charged that my influence during the session of the Legislature was exerted to prevent a reduction of rates. The last annual report submitted by the Commission, with no difference of views by the Commissioners, gave the rates of freight and passengers considered by us as just and reasonable. In support of our views a comparison of the rates of all the States in the Union was made and published. We were sworn officers and made this report with regard to the solemnity of our oaths. During the session of the Legislature the members of the Commission were invited to appear before the joint committe on

Railroads and give their views as to the justness of the rates now in force. Two of us responded. I, for one, was given a most respectful hearing by the committee. In my argument the report of the Commission was sustained by facts and figures. Nothing since has been shown to convince me that I was wrong. The charge that it was argued by me before the committee that to recommend a change of rates would be reflecting on the Commission is not warranted by the facts; nothing of the kind was ever alluded to by me—in this I am sure that I will be sustained by the committee.

In justice to myself I will say that I never entered the halls of the Legislature during its session, or expressed my views except when solicited to do so by its committee.

These facts have been intended to be given without feeling and in a most respectful manner, and I trust they will be so received by you.

In addition to the facts, I will say that the State of North Carolina has a Constitution which you and I have sworn to support. This Constitution and the laws as expounded guarantee protection to its humblest citizen. To a lawyer of your acknowledged ability, it may appear presumptuous for me to call to your attention Sections 4 and 5, Article 6, of the State Constitution, which reads as follows:

"The following classes of persons shall be disqualified for office: First, all persons who shall deny the being of Almighty God; second, all persons who shall have been convicted of treason, perjury or of any other infamous crime, etc." See also Article 4, Section 31. Also Article 1, Section 19, of Bill of Rights. This I will copy in full, as it is regarded by every freeman as a bulwark of liberty. It reads as follows: "In all controversies at law respecting property, the ancient mode of trial by jury is one of the best securities of the rights of the people, and ought to remain sacred and inviolable."

CALDWELL *v.* WILSON.

See also the 14th amendment of the Constitution of the United States, which forbids any state to deprive a citizen of life, liberty or property without due process of law. See also decisions of our Supreme Court: *Hoke* v. *Henderson*, 4 Devereux; *Cotton* v. *Ellis*, 7 Jones; *Bunting* v. *Gales*, 77 N. C.; *Brown* v. *Turner*, 70 N. C.; *Howerton* v. *Tate*, 70 N. C. Legislature cannot confer on an executive judicial powers. See Cooley on Constitutional Limitations. Act 1891, making Railroad Commission a Court of Record."

And on the 23rd day of September, 1897, the said Governor of North Carolina issued and sent to the defendant the following communication and order:

"EXECUTIVE DEPARTMENT,
Raleigh, N. C., September 23, 1897.

To JAMES W. WILSON, ESQ.,
Chairman of Railroad Commission.

SIR: Take notice that after due investigation and consideration I am convinced that you have violated the Railroad Commission law in some of the particulars mentioned in my letter to you August 24, 1897, and that you have not only violated said Act in the specification set out in said Act, but that you have otherwise, within the meaning and intent and words of said Act, become disqualified to act.

Now, therefore, in obedience to the duty imposed upon me by said Act of the Assembly I do hereby suspend you from the office of Railroad Commissioner and Chairman of said Commission, such suspension to continue until the question of your removal or restoration shall be determined by a majority of the General Assembly in joint session. The fact of your suspension together with the reasons therefor and the evidence, documents and information connected therewith will be reported to the next General Assembly.

You will further take notice that under and by virtue of

the powers conferred and duties imposed by law upon the Chief Executive I have appointed L. C. Caldwell, Esq., of the County of Iredell, to fill the vacancy created by your suspension.

Inasmuch as you are understood to deny the power of the Executive to suspend you from office as provided by the Statutes, I have requested Mr. Caldwell to make demand upon you for the possession of the office and, upon your refusal, to bring action therefor to the end that the title to the office may be judicially determined.

(Signed)          D. L. RUSSELL,<br>
Governor."

To which communication and order the said Governor received the following reply:

"RALEIGH, N. C., September 24, 1897.
To D. L. RUSSELL, Governor.

SIR: Yours of the 23rd inst. is hereby acknowledged. In reply I will say that I shall disregard your order to suspend, but will continue to do business at the old stand until removed by a tribunal other than a self-constituted "Star Chamber."          (Signed)          JAS. W. WILSON,

Chairman Railroad Commission."

4th. And therefore the relator avers and so charges on information and belief that on the said 23rd day of September, 1897, his Excellency, Daniel L. Russell, Governor of the State of North Carolina, in pursuance of the power and authority vested in him by Section 1, Chapter 320, of the laws of the State of North Carolina, passed by the General Assembly at its session of 1891, ratified the 5th day of March, 1891, and in execution of duty devolved upon him by the said Act, suspended the said James W. Wilson from the said office of Railroad Commissioner and as Chairman of said Commis-

sion. That on the said 23rd day of September, 1897, the said D. L. Russell, Governor of North Carolina as aforesaid, appointed the relator, L. C. Caldwell, a Railroad Commissioner and Chairman of the Railroad Commission to fill the vacancy caused by the suspension of the said James W. Wilson from said office of Commissioner and Chairman of said Commission from the said 23rd day of September, 1897, to continue until the next General Assembly, shall determine the removal of said James W. Wilson or until your successor is elected and qualified according to law.

5th. That the plaintiff relator duly qualified as Railroad Commissioner and Chairman of said Commission by taking the oath prescribed by law before DAVID M. FURCHES, one of the Justices of the Supreme Court of North Carolina, which oaths were duly deposited in the office of the Secretary of State.

6th. That the plaintiff relator since his appointment and qualification as aforesaid, and before the institution of this action, demanded of the said James W. Wilson that, he, the said James W. Wilson, should vacate the said office of Railroad Commissioner and surrender the same to the relator, and the said James W. Wilson refused to vacate and surrender the said office to the relator in words and figures, to-wit:

"SEPTEMBER 28TH, 1897.

HON. L. C. CALDWELL, *Statesville, N. C.*

DEAR SIR: Your favor of the 25th making your demand for the office of Railroad Commissioner, together with all the papers, records, rights and privileges thereto belonging, was duly served upon me by the Sheriff of Burke County. In reply will say that I most respectfully decline to accede to your request.      Yours very truly,      JAMES W. WILSON,
*Chairman Railroad Commission.*"

7th. That the defendant James W. Wilson, notwithstanding the suspension from the office of Railroad Commissioner

and Chairman of said Commission by the Governor of North Carolina, as hereinbefore set forth, refuses to vacate the same, and does now unlawfully usurp, intrude into, hold and exercise the said office of Railroad Commissioner and Chairman of said Commission, and does now prevent and hinder the relator from performing the duties of said office.

8th.   That said office of Railroad Commissioner is an office of trust and profit under the laws of North Carolina.

9th.   That leave to bring this action has been given by the Attorney-General of said State, which leave is attached hereto.

Wherefore the plaintiff demands judgment:

1st.   That the defendant has been suspended from his office of Railroad Commissioner and Chairman of said Commission according to law.

2nd.   That the defendant be adjudged guilty of unlawfully holding and exercising said office, and that he be fined $2,000 in pursuance of the Statute.

3rd.   That the relator has been duly appointed to fill the vacancy caused by the suspension of the defendant, and is entitled to hold and exercise the said office.

4th.   That the defendant be ousted from and the relator inducted into said office.

5th.   For such other and further relief as may be just and right and for costs of this action."

The answer was as follows:

The defendant answering the complaint, says:

1.   That section 1 thereof is admitted.

2.   That section 2 thereof is admitted.   Defendant's term of office began April 1, 1893, and ends April 1, 1899.

3.   That section 3 of the complaint is admitted.

4.   That section 4 of the complaint is denied.   But defendant admits that the Governor undertook or attempted to suspend or remove the defendant from his said office of

Railroad Commissioner and designated the plaintiff's relator, L. C. Caldwell, to fill the vacancy which he had attempted to create.

5. That the allegations in section 5 of the plaintiff's complaint are not true. He admits that said Caldwell has taken the oath prescribed by law for Railroad Commissioner.

6. The defendant admits section 6 of the complaint, except that he does not admit the appointment and qualification of said Caldwell any further than he has hereinbefore admitted the same.

7. That he denies section 7 of the complaint, but he admits that he refuses to vacate his office of Railroad Commissioner and to surrender the same to the relator. The defendant is advised that his suspension was illegal and that he is still entitled to discharge the duties of his office.

8. Sections 8 and 9 of the complaint are admitted.

9. That the General Assembly of North Carolina at its session of 1891 under the authority of the Constitution of the State, Article 4, Sections 2, 12 and 30, passed an Act constituting a Railroad Commission with the powers of a Court, which was ratified the fifth of March, 1891, and under said Act the defendant was elected a member thereof at the session of 1893 for the term of six years; and on the ninth of March, 1891, the General Assembly of North Carolina passed an Act declaring "that the Railroad Commission elected at this session of the General Assembly and their successors in office be and they are hereby created and constituted a Court of Record inferior to the Supreme Court and shall be known as the Board of Railroad Commissioners, and as such shall have all the powers and jurisdiction of a Court of general jurisdiction as to all subjects embraced in the Act creating such Railroad Commission."

10. That the Act ratified March 5, 1891, in section 1 thereof, provides "that said Commissioners shall not jointly

CALDWELL *v.* WILSON.

or severally or in any way be the holder of any stock or bonds or the agent or attorney or employee of any such company, or have any interest in any way in such company, and shall so continue during the term of his office, and in case any Commissioner shall, as distributee or legatee or in any other way, have or become entitled to any stock or bonds or interest therein of any such company, he shall at once dispose of the same, and in case any Commissioner shall fail in this or in case any one of them shall become disqualified to act, then it shall be the duty of the Governor to suspend him from office and to report the fact of his suspension, together with the reason therefor, to the next General Assembly, and the question of his removal from office shall be determined by a majority of the General Assembly in joint session. In any case of suspension the Governor shall fill the vacancy, and if the General Assembly shall determine that the Commissioner suspended shall be removed, then the appointee of the Governor shall hold until his successor is elected and qualified as hereinbefore provided, but if the General Assembly shall determine that the suspended Commissioner shall not be removed from his office, then the effect shall be to reinstate him in said office. The person discharging the duties of said office shall be entitled to the salary for the time he is so engaged, but a commissioner who is suspended shall be allowed the salary during his suspension in case he should be reinstated by the next General Assembly: *Provided*, that no person is eligible as such commissioner who shall have been an attorney of any such company within twelve months next preceding his election to such office;" but the defendant avers, being so advised, that said provisions are unconstitutional and void.

11. That, as appears by the complaint, the said Daniel L. Russell, Governor, preferred the charges contained in his

communication of August 24, 1897, which is set out in section 3 of complaint. The defendant appeared before the said Governor at the day fixed and filed a written denial of said charges with only an affidavit from V. E. McBee as follows: "In 1893, I was general superintendent of the Western North Carolina Railroad, and during the said year appointed the said James W. Wilson, Jr., station agent at Morganton, and in making such appointment did so without consultation or conference with Mr. Wilson's father. J. W. Wilson, Jr., had, several years before appointed station agent, served as clerk in the said office and proved himself competent to fill the agency." Defendant also filed testimonials from citizens of Morganton showing the business capacity and fitness of said J. W. Wilson, Jr., for the position of agent at that place. And thereupon the defendant demanded of the said Governor that the evidence against him be produced, and that he have an opportunity to confront his accusers and cross-examine the witness. This was refused, the Governor stating that he had no power to subpœna witnesses.

12. That notwithstanding the denials of the defendant and the affidavit in support thereof, the said Governor, without evidence and without a trial, undertook to find generally that the defendant had violated the Railroad Commission law in some of the particulars mentioned in his letter of August 24th, 1897, and that the defendant had not only violated the said act in the specifications set out in said act, but that he had otherwise within the meaning and intent and words of said act become disqualified to act. Thereupon the said Governor, without a more specific finding, undertook to suspend the defendant and deprive him of his said office.

13. The defendant denies that he is the joint owner with Col. A. B. Andrews, the first vice-president of the Southern Railroad, of the Round Knob hotel. He, for a valuable con-

sideration, sold and conveyed the same between the date of the Governor's letter of August 24th, 1897, and August 30th, 1897, by deed to R. M. Brown, as he was entitled to do under the provisions of said Act of the General Assembly.

14. That the defendant denies that the said hotel property is worthless as a hotel except when designated and patronized by the Southern Railroad as an eating house for their passenger trains.

15. That the defendant denies that the said hotel property has been unoccupied and unused for any purpose for several years past, and has brought in no revenue to defendant. Up to 1896 it was under lease for five years to Mieusett and Friscard at an annual rental of $500. This lease expired some time in the fall or winter of 1896. While three years' rent is still due by them it is perfectly good and collectable, and the same is now in suit.

17. That the defendant denies that it is impossible to use, rent or lease said property unless some understanding, agreement or contract can be made with the Southern Railroad to designate and patronize the said hotel as a railroad eating-house.

18. That the defendant denies, except as stated herein, that he and the other owner or owners of said hotel property secured any agreement, understanding or contract from the Southern Railroad Company to abandon other eating-houses and designate Round Knob as an eating-house, and that by virtue of said agreement with said railroad he was able to lease said hotel property to S. Otho Wilson, or to his mother through the said Wilson, for profit. The facts are fully stated in the defendant's letter of August 30th, 1897, set out in the complaint.

19. That the defendant denies that his son, who is now twenty-seven years of age, was appointed agent at Morganton of the Southern Railroad over others entitled to the place

by promotion under the practice of the company, and that this was done for his accommodation. He was in the very line of promotion and was appointed in 1893 by V. E. McBee, former superintendent, in pursuance of a previous promise, as defendant is informed and believes, on account of a vacancy in the office in Morganton. His said son was chief clerk to the agent and was appointed on his resignation. Defendant at first thought he may have spoken to Mr. McBee in favor of his son, but on more careful inquiry and reflection is convinced he did not do so, and he therefore denies that he said anything about it to said McBee.

20. That defendant acquired the Round Knob hotel property in 1881. The hotel was built in 1881, or thereabouts, and has been a railroad eating-house at divers times since its erection.

21. The defendant denies that he has acquired any interest in any way in the Southern Railroad Company in violation of law.

22. The defendant denies that he has become disqualified to act as a fair Judge or Commissioner.

23. That under the laws of North Carolina the defendant has a property in his office, and he demands to have the charges preferred against him tried by a jury in this action.

24. That by the Constitution of the State of North Carolina, Article 6, Sections 1, 2 and 3, it is provided that every male person born in the United States, and every male person who has been naturalized, twenty-one years old or upward, who shall have resided in the State twelve months next preceding the election and ninety days in the county in which he offers to vote, shall be deemed an elector and eligible to office, except all persons who shall deny the being of Almighty God, and all persons who shall have been convicted of treason, perjury or of any other infamous crime since becoming citizens of the United States, or of corruption

CALDWELL *v.* WILSON.

or malpractice in office, unless such person shall have been legally restored to the rights of citizenship.

25. That this defendant is in every way qualified to hold office under the requirements aforesaid.

26. That the defendant is advised, and so avers, that any provision of the Railroad Commission Act, Chapter 320 of the Acts of the General Assembly of North Carolina, passed at the session of 1891, which prescribe other and different qualifications for the office of Railroad Commissioner than those laid down by the said provisions of the Constitution, are unconstitutional and void.

27. That the Board of Railroad Commissioners is a Court of Record and the Commissioners are Judges under and by virtue of Article 4, Section 12, of the Constitution of the State by which it is provided, "The General Assembly shall have no power to deprive the Judicial Department of any power or jurisdiction which rightfully pertains to it as a co-ordinate department of the Government, but the General Assembly shall allot and distribute that portion of this power and jurisdiction which does not pertain to the Supreme Court among the other Courts prescribed in this Constitution or which may be established by law in such manner as it may deem best, provide also a proper system of appeals, and regulate by law when necessary the method of proceeding, in the exercise of their powers, of all Courts below the Supreme Court so far as the same may be done without conflict with other provisions of this Constitution."

28. That by Article 4, Section 30, of the State Constitution it is further provided, "In case the General Assembly shall establish other Courts inferior to the Supreme Court the presiding officers and clerks thereof shall be elected in such manner as the General Assembly may from time to time prescribe, and they shall hold their offices for a term not exceeding eight years."

CALDWELL *v.* WILSON.

29.   That by Article 4, Section 31, of the State Constitution it is further provided, "Any Judge of the Supreme Court or of the Superior Court and the presiding officers of such Courts inferior to the Supreme Court as may be established by law may be removed from office for mental or physical inability upon a concurrent resolution of two thirds of both houses of the General Assembly.   The Judge or presiding officer against whom the General Assembly may be about to proceed shall receive notice thereof accompanied by a copy of the causes alleged for his removal at least twenty days before the day on which either house of the General Assembly shall act thereon."

30.   That the alleged causes of removal set up by the Governor are such as apply to no other Judges or presiding officers of Courts or any other public officers in the State, and the Governor has no power to remove or suspend any other Judge or presiding officer of Courts or any other officer not appointed by him.   Wherefore, the defendant says the Statute and the said action of the Governor deprive him of the equal protection of the laws and are in violation of the Fourteenth Amendment of the Constitution of the United States, and this defendant expressly claims the protection of said Amendment.

31.   That, as appears by section 3 of the complaint, the Governor cited this defendant before him to answer the charges preferred against him.   This defendant fully answered, and generally and specifically denied the charges. Thereupon, the defendant demanded to be confronted with his accusers and to hear and cross-examine the witnesses against him.   This was refused and no witness or other evidence was produced; and thereafter the Governor made his decision, by which he attempted to remove the defendant till the meeting of the General Assembly, early in January, 1899.   The defendant submits that this action was without

a hearing and without evidence to support it, without any trial and without any right of appeal. Wherefore he says the said action deprives him of his liberty and property without due process of law, and is in direct conflict with the Fourteenth Amendment to the Constitution of the United States, and the defendant expressly claims the protection of said Amendment.

32. That he submits to the Court whether, by the action of the Governor aforesaid, the privileges and immunities of defendant as a citizen of the United States have been abridged in violation of the Fourteenth Amendment to the Constitution of the United States, and, if so, he expressly claims the protection of said Amendment.

33. That the defendant is advised that the General Assembly had no power to confer upon the Governor the right of removal or suspension, nor to confer upon itself the power thereafter to pass upon the question of removal or restoration, nor to add to the qualifications for holding office. And the defendant further submits that the matters and things charged against him, and which he fully denies, do not come within the provisions of the Act of the General Assembly and do not warrant the action of the Governor.

34. The defendant submits, being so advised, that the action of the Governor was illegal and void and the defendant is entitled to continue in the exercise of the duties of his office.

Wherefore the defendant prays judgment that he go without day and recover of the plaintiff his costs of action."

The defendant, by leave of the Court, amended section 15 of answer by inserting in lieu of all after the word defendant, in line 3 thereof: "In the year 1891 the defendant sold and conveyed said property to The Carolina Investment Company, a corporation under the laws of this State; and on the 18th day of April, 1893, said company leased it to Stephen Mieusett and Emil Friscard for five years, beginning May 1st

CALDWELL *v.* WILSON.

1893, and ending May 1st, 1898, at the following rental: $250.00 per year for the first two years; $300.00 for the third year; $400.00 for the fourth year, and $500.00 for the fifth year, payments to be made quarterly. About the — day of ———, 1893, the said company, wishing to reconvey said property to the defendant, and not having registered its deed, surrendered it to the defendant, and surrendered the property to him, upon the agreement that he would recognize the lease to Mieusett & Friscard. In the fall or winter of 1896 said Mieusett & Friscard abandoned the property and it was leased to Mrs. Mary Wilson about the —— day of January or February, 1897. While Mieusett & Friscard are in arrears for two or three years rent it is perfectly good and collectible, and is now in suit."

The defendant tendered the issues set out in the opinion and demanded a trial by jury.

The Court refused to submit the issues to the jury and the defendant excepted.

The relator moved for judgment upon the pleadings, which motion was granted and the defendant excepted and appealed, upon the assignments of error set out in the opinion.

*Messrs. A. C. Avery, Armfield, Turner & Cowles* and *W. J. Montgomery,* for plaintiff.

*Messrs. R. O. Burton, J. D. Shaw, T. N. Hill, J. C. L. Harris, Armistead Burwell* and *John G. Bynum,* for defendant (appellant).

DOUGLAS, J.: This is an action in the nature of *quo warranto,* brought to try the title to the office of Railroad Commissioner. The defendant was suspended by the Governor under the provisions of Section 1 of Chapter 320 of the Laws of 1891, known as The Railroad Commission Act, and the plaintiff appointed to fill the vacancy so

CALDWELL v. WILSON.

created.  The part of the Act now under consideration is as follows:

"Said Commissioners shall not be jointly or severally, or in any way be the holder of any stock or bonds, or be the agent or attorney or employee of any such company, or have any interest in any way in any such company, and shall so continue during the term of his office; and in case any Commissioner shall, as distributee or legatee or in any other way, have or become entitled to any stock or bonds or interest therein of any such company, he shall at once dispose of the same; and in case any Commissioner shall fail in this, or in case any one of them shall become disqualified to act, then it shall be the duty of the Governor to suspend him from office and to report the fact of his suspension, together with the reason therefor, to the next General Assembly; and the question of his removal from office shall be determined by a majority of the General Assembly in joint session.  In any case of suspension the Governor shall fill the vacancy, and if the General Assembly shall determine that the Commissioner suspended shall be removed, then the appointee of the Governor shall hold until his successor is elected and qualified as hereinbefore provided, but if the General Assembly shall determine that the suspended Commissioner shall not be removed from his office, then the effect shall be to reinstate him in said office.  The person discharging the duties of said office shall be entitled to the salary for the time he is so engaged, but the Commissioner who is suspended shall be allowed the salary during his suspension in case he should be reinstated by the next General Assembly."

The following facts appear from the record:  On the 24th day of August, 1897, the Governor wrote to the defendant calling his attention to the said Act, reciting certain allegations as to the defendant's connection with the Southern

121—57

Railway Company, and requiring the defendant to show cause in writing on or before the first day of September, 1897, why he should not be suspended from office, and a report thereof made to the next General Assembly.

On the 30th day of August, 1897, the defendant filed with the Governor his written answer, among other defences, denying the power of the Governor to suspend him, and alleging the unconstitutionality of that portion of the Railroad Commission Act authorizing such suspension.

On the 23rd day of September, 1897, the Governor notified the defendant in writing that after due investigation and consideration he was convinced that the defendant had violated the Railroad Commission Law in some of the particulars mentioned in his letter of August 24th and that the defendant had not only violated said Act in the specifications set out in said Act, but that the defendant had otherwise within the meaning and intent and words of said Act become disqualified to act; and that therefore he, the Governor, did suspend the defendant from the office of Railroad Commissioner and Chairman of said Commission, and did appoint thereto the relator, Caldwell.

The defendant on September 24th, replied to the Governor as follows: "Sir:—Yours of the 23rd inst. is hereby acknowledged. In reply I will say that I shall disregard your order to suspend, but will continue to do business at the old stand until removed by a tribunal other than a self constituted 'Star Chamber.' " The relator qualified at once, and demanded of the defendant the possession of the said office, together with all its records, which was refused by the defendant.

Thereupon the relator brought this action to recover said office, and filed his complaint, fully setting out his cause of action. The defendant answered alleging that the Governor had no power to suspend him; that if such power existed,

the Governor had attempted to exercise it in an arbitrary and unlawful manner, without giving him the fair hearing to which he was entitled by law; that the part of the Railroad Commission Act authorizing such suspension was unconstitutional inasmuch as it imposed additional and unusual qualifications for said office, and interfered with the independent tenure of a judicial officer, and deprived him of his property in said office "without due process of law;" and that his suspension in manner and substance was in violation of the Fourteenth Amendment to the Constitution of the United States. At the conclusion of the reading of the pleadings the defendant tendered the following issues and demanded a trial by jury:

1.   Is the plaintiff entitled to the office of Railroad Commissioner?

2.   Does the defendant unlawfully intrude into, hold and exercise the office of Railroad Commissioner and Chairman of said Commission?

3.   Has the defendant acquired any interest in any way in the Southern Railway Company in violation of law?

4.   Has the defendant become disqualified to act as a fair Judge or Commissioner, or has he become in any way disqualified to act?

5.   Did the defendant, prior to September 1, 1897, sell and convey for a valuable consideration the Round Knob Hotel to R. M. Brown?

6.   Did the defendant demand of the Governor that the evidence against him be produced and that he have an opportunity to confront his accusers and cross-examine the witnesses against him?

7.   Was said demand refused?

8.   Was any evidence produced?

Thereupon the plaintiff moved for judgment upon the complaint and answer. The defendant here claimed that

such motion was irregular, and that the plaintiff should either demur or go to trial before the jury. His Honor, then, by consent, heard argument both upon the right to a jury trial and upon said motion for judgment. The defendant's exceptions were as follows: "During the argument the defendant contended, among other things, that the Statute, Laws of North Carolina, Session of 1881, Chapter 320, Section 1, and the action of the Governor set out in the pleadings, deprived him of the equal protection of the laws, and deprived him of his office without due process of law, as set out in the answer, and therefore the Statute and said action of the Governor were in violation of the Fourteenth Amendment to the Constitution of the United States, and he expressly claimed the protection of said Amendment. These contentions were disallowed and the defendant excepted. Exception 1.

Exception 2. The Court refused to submit the issues tendered, or any issues, and the defendant excepted.

Exception 3. The Court further ruled that the plaintiff was entitled to judgment upon the pleadings. The defendant excepted.

Exception 4. The defendant moved for a new trial for the foregoing alleged errors. Motion overruled and the defendant excepted."

Thereupon judgment was rendered in favor of the plaintiff relator as follows: "First. That the defendant James W. Wilson has been duly suspended from his office of Railroad Commissioner and Chairman of said Commission, and is unlawfully holding and exercising said office. Second. That the relator, L. C. Caldwell, has been duly appointed to fill the vacancy caused by the suspension of said James W. Wilson from said office. Third. That the defendant James W. Wilson be ousted from said office of Railroad Commissioner and that the relator L. C. Caldwell be inducted into

CALDWELL *v.* WILSON.

said office and that the relator L. C. Caldwell recover of said defendant and the sureties on his bond the costs of this action to be taxed by the Clerk of this Court." The defendant excepted to this judgment and appealed to this Court.

The first exception cannot be sustained, as we are utterly unable to see any Federal question whatever involved in this action. The office of Railroad Commissioner, from which the defendant has been suspended, is an office existing solely under the Constitution and Laws of this State, and created to administer the Railroad Commission Act. It has no recognition in the Laws of the United States, does not interfere with inter-state commerce, and is concerned solely in domestic affairs and internal trade. The defendant was not deprived of his office without due process of law. He was cited to appear and answer certain charges, and he did appear and filed an answer. The written notice of the Governor, which was admittedly received and acted upon by the defendant, was, in effect, a citation and under the circumstances had all the force of a summons. The only object of a summons is to bring the defendant into Court by giving him legal notice, and if he voluntarily appears, without limiting his appearance, he is held to waive a summons, and is as completely in Court as if it had been served. The Court, or any other tribunal having jurisdiction of the subject matter, has thereafter complete jurisdiction of the person. *Jones* v. *Penland*, 19 N. C., 358; *Hyatt* v. *Tomlin*, 24 N. C., 149; *Duffy* v. *Averitt*, 27 N. C., 455; *Middleton* v. *Duffy*, 73 N. C., 72; *Wheeler* v. *Cobb*, 75 N. C., 21; *Etheridge* v. *Woodley*, 83 N. C., 11; *Penniman* v. *Daniel*, 95 N. C., 341; *Roberts* v. *Allman*, 106 N. C., 391. In *State* v. *Jones*, 88 N. C., 683, 685, this Court has said: "The object of *process* is to give notice and an opportunity to make defence to an action. The *scire facias* furnished this notice, and the sureties submitted to the jurisdiction and resisted

the demand for judgment. A defendant may appear without process, and his appearance dispenses with process, since its purpose is to bring him into Court, and he is in Court when he answers and defends the action. That this rule is by no means peculiar to this State will be seen by a reference to the Encyclopedia of Pleading and Practice, Vol. 2, page 639.

What is "due process of law" is generally difficult to define; but we think in the case at bar the defendant has no cause to complain on that score. As the protection of the Constitution of the United States is invoked, we deem it best to omit the numberless authorities in the different State Reports, and confine ourselves on this point to the decisions of that Court, essentially supreme wherever its jurisdiction attaches and where alone the decisions of this Court can ever be called in question.

The case of *Murray's Lessee* v. *The Hoboken Land & Improvement Co.*, 18 How. 272, was an action of ejectment in which the defendant claimed title to certain lands under a sale made by the United States Marshal by virtue of a distress warrant issued by the Solicitor of the Treasury. It was held that such a warrant of distress was not in conflict with the Constitution of the United States, and was "due process of law;" and that the action of the executive power in issuing the warrant was conclusive evidence of the facts recited in it, and of the authority to make a levy—citing *Prigg* v. *Pennsylvania*, 16 Pet. 621; *U. S.* v. *Nourse*, 9 Peters, 8; *Randolph's Case*, 2 Brock., 447; *U. S.* v. *Nourse*, 4 Cranch C. C., 151; *U. S.* v. *Bullock*, (cited 6 Pet. 485.) The Court further says: "Thus, it has been repeatedly decided in this class of cases, that upon their trial, the acts of executive officers, done under the authority of Congress, were conclusive, either upon particular facts involved in the inquiry or upon the whole title"—citing *Foley* v. *Harrison*, 15 Howard,

433; *Burgess* v. *Gray*, 16 How., 48. "It is also true that even in a suit between private persons to try a question of private right, the *action of the executive power, upon a matter committed to its determination by the Constitution and laws*, is conclusive"—citing *Luther* v. *Borden*, 7 Howard, 1; *Doe* v. *Braden*, 16 Howard, 635, and cited in *Walker* v. *Sauvinet*, 2 Otto, 93; *Davidson* v. *New Orleans*, 6 Otto, 102; *Springer* v. *U. S.*, 12 Otto, 586, 594; *Ex parte Wall*, 107 U. S., 290; *Hilton* v. *Merritt*, 110 U. S., 107; *Hurtado* v. *Cal.*, 110 U. S., 528, 542.

In the case at bar there can be no question of the right of the Governor to appoint the plaintiff if a vacancy legally existed. *Foster* v. *Kansas*, 112 U. S., 201, 204. The only question really at issue is the legality of the removal of the defendant, and in this view the State of North Carolina is the real party in interest, as it is her act, through her Chief Executive, of which the defendant complains. The State has surely as much interest in having her laws properly administered by officers of her choice, in every respect qualified for their duties, as the general government can have in the collection of its taxes. And we can see no reason why the action of the Governor in suspending the defendant from office in strict accordance with the provisions of a Statute, which we hold to be Constitutional, is not fully as much "due process of law" as was the sale of real estate under the warrant of distress, so held in *Murray* v. *Hoboken*, *supra*. Under the same authority we feel fully justified in holding that the action of the Chief Executive of this State, certainly an officer of higher relative rank and greater dignity than a mere Solicitor of the Treasury, is equally conclusive upon a matter committed to his determination by the Constitution and Laws of this State. It is, at least, of equal dignity with a tax-sale certificate, whose recitals are held to be evidence *prima facie* as to all and conclusive as to many of the

facts therein alleged. *De Treville* v. *Smalls*, 98 U. S., 517, 524.

The defendant has not been denied access to the Courts. In fact he did not attempt to appeal from the action of the Governor nor seek the aid of the Courts, but forcibly retained possession of an office from which he had been rightfully suspended, and forced the *plaintiff* to seek redress in this action. The Governor, in his notification of suspension to the defendant, distinctly recognized the right of the defendant to have it legally tested in the Courts, and made no attempt to dispossess him. The plaintiff has sought possession only "by the law of the land" as shown by the bringing of this action.

In *The Bank of Columbia* v. *Okley*, 4 Wheat, 235, it was held that a party may waive his right to trial by jury, by giving a note payable at a bank, the charter of which authorizes collection by summary process. The defendant may well be deemed to have waived his right to a trial by jury, if any such right he ever had, by accepting office under a Statute which expressly provided that he might be suspended by the Governor without reference to a jury.

In *Murray* v. *Hoboken*, *supra*, the Court also held, "That the auditing of the accounts of a receiver of public monies may be, in an enlarged sense, a Judicial act, must be admitted. So are all those administrative duties the performance of which involves an inquiry into the existence of facts and the application to them of rules of law. In this sense, the act of the President in calling out the militia under the Act of 1795 (12 Wheat, 19), or of a Commissioner who makes a certificate for the extradition of a criminal, under a treaty, is Judicial. But it is not sufficient, to bring such matters under the Judicial power, that they involved the exercise of judgment upon law and fact—citing *U. S.* v. *Ferreira*, 13 How. 40.

It may be urged that a distress warrant for the collection of taxes was held to be "due process of law" because such

proceeding was in accordance with the common and Statute law of England; but so, also, was the suspension of a public officer.

We see no error in the trial of the action in the Court below, and we affirm its judgment after a full hearing of the defendant's appeal. This much, at least, is "due process of law." *Morley* v. *Lake Shore R. Co.*, 146 U. S., 162.

Due process of law does not necessarily imply in all cases the right of trial by jury. If it did, the equitable jurisdiction of the Federal Courts would practically be annulled. The records of this Court show, what is common knowledge, that, in the recent reorganization of a great railway system, mortgages involving millions of dollars were foreclosed in the Circuit Court of the United States, and the stockholders deprived of every vestige of their property, without any suggestion of a jury.

In *Walker* v. *Sauvinet*, 92 U. S., 90, the Court (Waite, C. J.) says: "*All questions arising under the Constitution of the State alone are finally settled by the judgment below.* We can consider only such as grow out of the Constitution of the United States. A trial by jury in suits at common law pending in the State Courts is not, therefore, a privilege or immunity of national citizenship which the States are forbidden by the Fourteenth Amendment to abridge. A State cannot deprive a person of his property without due process of law; but this does not necessarily imply that all trials in the State Courts affecting the property of persons must be by jury. This requirement of the Constitution is met if the trial is had according to the settled course of judicial proceedings. Due process of law is process due according to the law of the land. This process in the States is regulated by the *law of the State*." In *Leeper* v. *Texas*, 139 U. S., 462, 467, it was held, "That whether Statutes of a Legislature of a State have been duly enacted in accordance with the re-

121—58

quirements of the Constitution of such State is not a Federal question, and the decision of State Courts as to what are the laws of the State is binding upon the Courts of the United States,"—citing *South Ottawa* v. *Perkins,* 94 U. S., 260, 268; *Post* v. *Supervisors,* 105 U. S., 667; *Norton* v. *Shelby County,* 118 U. S., 425, 440; *Railroad Co.* v. *Georgia,* 98 U. S., 359, 366; *Baldwin* v. *Kansas,* 129 U. S., 52, 57; and "that law in its regular course of administration through Court of Justice is due process, and when secured by the law of the State the Constitutional requirement is satisfied; and that due process is so secured by laws operating on all alike, and not subjecting the individual to the arbitrary exercise of the powers of government unrestrained by the established principles of private right and distributive justice;" citing *Hurtado* v. *Cal.,* 110 U. S., 516, 535; *In Re Kemmler,* 136 U. S., 436, 449; *Caldwell* v. *Texas,* 137 U. S., 692.    See also *Giozza* v. *Tierman,* 148 U. S., 657; *Duncan* v. *Mo.,* 152 U. S.. 377; *Missouri, &c., R. Co.* v. *Mackey,* 127 U. S., 205; *Railroad Co.* v. *Herrick,* 127 U. S., 210; *State* v. *Muse,* 20 N. C., 319; *State* v. *Chambers,* 93 N. C., 600; *State* v. *Moore,* 104 N. C., 714.

In *Hurtado* v. *Cal., supra,* in which the meaning of the phrase "due process of law" is elaborately discussed, it was held that the words "due process of law" in the 14th Amendment to the Constitution do not necessarily require an indictment by the grand jury in a prosecution by a State for murder; and that a conviction upon an information for murder in the first degree, and a sentence of death thereon, was not without due process of law and was, therefore, not in violation of the Constitutional provision. *McNulty* v. *Cal.,* 149 U. S., 645; *Vincent* v. *Cal.,* Ibid, 648.

In *Munn* v. *Illinois,* 94 U. S., 113, 134, the Chief Justice delivering the opinion of the Court, says: "A person has no property, no vested interest, in any rule of the common law. That is only one of the forms of municipal law, and is no

more sacred than any other.   Rights of property, which have been created by the common law can not be taken away without due process; but the law itself, as a rule of conduct, may be changed at the will or even at the whim of the Legislature, unless prevented by Constitutional limitations. Indeed, the great office of Statutes is to remedy defects in the common law as they are developed, and to adapt it to the changes of time and circumstances."

In *Davidson* v. *New Orleans,* 96 U. S. 97, 105, Justice Miller, for the Court, says that "it is difficult if not impossible to frame a definition of the Constitutional phrase 'without due process of law,' at once perspicuous, comprehensive and satisfactory," but that "it is not possible to hold that a party has, without due process of law, been deprived of his property, when, as regards the issues affecting it, he has by the laws of the State a fair trial in a Court of Justice, according to the modes of proceeding applicable to such case."   And, citing, *Murray* v. *Hoboken, supra,* he further says: "An exhaustive Judicial inquiry into the meaning of the words 'due process of law,' as found in the Fifth Amendment, resulted in the unanimous decision of this Court that they do not *necessarily* imply a regular proceeding in a Court of Justice, or after the manner of such Courts."

The origin, intent and scope of the Thirteenth and Fourteenth Amendments to the Constitution of the United States are fully and ably discussed in the *Slaughter House Cases,* 16 Wallace, 36, but, as no reasonable extract would do justice to the opinion, it can properly be cited only as a whole.

In *Missouri* v. *Lewis,* 101 U. S., 22, 31, it is said that "The Fourteenth Amendment does not profess to secure to all persons in the United States the benefit of the same laws and the same remedies.   Great diversities in these respects may exist in two States separated only by an imaginary line.   On one side of this line there may be a right of trial

by jury, and on the other side no such right. Each State prescribes its own modes of Judicial proceeding."

In *Ex Parte Wall*, 107 U. S., 265, a rule was served upon the petitioner, by the United States District Judge, without any previous affidavit and upon mere hearsay information, to show cause why he should not be disbarred from practicing as an attorney for taking part in a lynching. The respondent filed a written answer denying the charge, and excepting to the jurisdiction of the Court. After the examination of one witness and hearing the argument of counsel, the Court overruled the exceptions and made an order prohibiting the respondent from practicing at the bar of said Court, until a further order. On petition for *mandamus* it was held that the proceeding was regular and was due process of law, and that it was not a *criminal* proceeding, and not intended for punishment, but to protect the Court from the official ministration of persons unfit to practice as attorneys therein. The proceeding in that case was certainly much more summary and less regular than in the case at bar, while the avowed object was the same. The defendant herein was not suspended by the Governor as a punishment for any crime, as he was not charged with crime, but simply with a legal disqualification. The object of his suspension, pending a Legislative determination, was to prevent the danger and scandal of having important official duties performed by one legally disqualified. The Railroad Commission was constituted by the Legislature in obedience to a strong popular demand, and the people have a right to require that the men, charged with the grave duty of deciding between them and the great transportation companies which practically control the commerce of the country, should be absolutely free from the slightest suspicion of interest or bias. Such a requirement is based upon the highest principle of public policy, and is no more unreasonable than to

say that a Clerk or Sheriff must give bond for the faithful performance of his duties, that an executor or trustee cannot buy at his own sale, and that a Judge shall not sit in his own case.

Such provisions are not uncommon. A remarkable instance may be found in the Act of August 13, 1888, (25 Statutes at Large, U. S., 433), which reads as follows: "Section 7. That no person related to any Justice or Judge of any Court of the United States by affinity or consanguinity within the degree of first cousin shall *hereafter* be appointed by such Court or Judge to or employed by such Court or Judge in any office or duty in any Court of which such Justice or Judge may be a member."

It is no crime to be related to a Judge of the United States; nor can it be any reflection upon the personal character of such relative and, yet, it is made by law an absolute disqualification for office.

The object of the law is clearly not to punish one who has committed no offence but to relieve the Judges from any temptation to appoint incompetent officials, and to secure to the people in the selection of their agents the best judgment of the Courts.

As to the equal protection of the laws guaranteed by the Constitution of the United States, it is well settled that special legislation is not objectionable where it is made to apply equally and without unjust discrimination to all who may be affected by it. The Fourteenth Amendment does not prohibit legislation limited as to objects or territory, but merely that all persons subjected to it shall be treated alike under like circumstances and conditions. *Hayes* v. *Missouri*, 120 U. S., 68; *Railroad Co.* v. *Mackey*, 127 U. S., 205; *Lowe* v. *Kansas*, 163 U. S., 81, 88.

In *Walston* v. *Nevin*, 128 U. S., 578, 582, the Court says: "And wherever the law operates alike on all persons and

property, similarly situated, equal protection cannot be said to be denied;" citing *Wurts* v. *Hoagland,* 114 U. S., 606; *Railroad Co.* v. *Richmond,* 96 U. S., 521, 529. "The remedy for abuse is in the State Courts, for, in the language of Mr. Justice Field in *Mobile* v. *Kimball,* "this Court is not the harbor in which the people of a city or county can find a refuge from ill-advised, unequal and oppressive State legislation."

In *Giozza* v. *Tiernan,* 148 U. S., 657, 651, the Court says: "Irrespective of the operation of the Federal Constitution and restrictions asserted to be inherent in the nature of American institutions, the general rule is that there are no limitations upon the legislative power of the Legislature of a State except those imposed by its written Constitution."

In *Duncan* v. *Missouri,* 152 U. S., 377, it was held that the privileges and immunities of citizens of the United States protected by the Fourteenth Amendment, are such privileges and immunities as arise out of the nature and essential character of the Federal Government, and are granted or secured by the Constitution of the United States. Miller on the Constitution, 662; *Presser* v. *Illinois,* 116 U. S., 252.

In the case of *Kennard* v. *Louisiana,* 92 U. S., 480, the plaintiff in error was summarily removed from the office of Associate Justice of the Supreme Court of Louisiana, its Court of last resort, by a mere rule of Court. The plaintiff took out a writ of error, asserting that he was deprived of his office without due process of law, in violation of the Fourteenth Amendment to the Constitution of the United States. The opinion of the Court, delivered by Chief Justice Waite, without dissent, and remarkable equally for its clear exposition of the law and admirable condensation, affirmed the judgment, for the following reasons: "The question

before us is, not whether the Courts below, having jurisdiction of the case and the parties, have followed the law, but whether the law, if followed, would have furnished Kennard the protection guaranteed by the Constitution. Irregularities and mere errors in the proceedings can only be corrected in the State Courts. *Our authority does not extend beyond an examination of the power of the Courts below to proceed at all.*
.    .    .    .    It will thus be seen that the Act relates specially to the Judges of the Courts of the State, and to the internal regulations of a State in respect to its own officers.
.    .    .    .    He had an opportunity to be heard before he could be condemned. This was "process," and, when served, it was sufficient to bring the incumbent into Court, and to place him within its jurisdiction. In this case, it is evident from the record that the rule was made, and that it was in *some form* brought to the attention of Kennard, for on the return day he appeared. At first, instead of showing cause why he refused to vacate his office, he objected that he had not been properly cited to appear; but the Court adjudged otherwise. He then made known his title to the office; in other words he showed cause why he refused to vacate. This was, in effect that he had been commissioned to hold the office till the end of the next session of the Senate, and that time had not arrived. Upon this he asked a *trial by jury*. This the Court *refused*, and *properly*, because the law under which the proceedings were had provided in terms that there should be no such trial.
.    .    .    .    A mere statement of the facts carries with it a complete answer to all the Constitutional objections urged against the validity of the Act. The remedy provided was certainly speedy; but it could only be *enforced* by means of orderly proceedings in a Court of competent jurisdiction in accordance with rules and forms established for the protection of the rights of the parties. In this par-

ticular case, the party complaining not only had the right to be heard, but *he was in fact heard*, both in the Court in which the proceedings were originally instituted, and, upon his appeal, in the highest Court of the State."

I. have italicised the words peculiarly operating upon the case at bar.    If an Inferior Court of the State of Louisiana can, by virtue of a Statute of that State, upon a mere rule issued upon a *prima facie* case created by said Statute, *remove* from office a Justice of its highest Constitutional Court, we cannot see why the Chief Executive of this State, acting under express authority of a Statute, and in strict accordance with its terms cannot *suspend* a member of an inferior administrative Court.    At least such action affects only the internal policy of North Carolina when dealing with its own officers, and should be judged by its Constitution and laws alone.

We have fully considered the first exception, not only from its Federal relation, but also from its important bearing upon the validity of the Act under our own Constitution, which provides that : "No person ought to be taken, imprisoned or disseized of his freehold, liberties or privileges, or outlawed or exiled, or in any manner deprived of his life, liberty or property, *but by the law of the land.*"    Therefore, if we were of opinion that the defendant had been deprived of his property in the office "without due process of law," that is, such process as is due to the peculiar circumstances of his case by the law of the land, it would be our duty to at once reverse the judgment of the Court below. In going over the ground covered by this exception, we have necessarily been compelled to say much that is applicable to the other exceptions, and which will not be repeated.

The second exception to the refusal of the Court to submit the issues tendered, or any issues, is practically directed to the denial of a trial by jury.    This we think, was prop-

erly refused, as there were no disputed facts before the Court. It is not denied that the Governor notified the defendant to appear and answer; that the defendant did so appear and answer; that the Governor subsequently suspended the defendant, giving him written notice of said action, and appointed the relator; that the relator duly qualified, demanded possession of the office, was refused by the defendant, and brought suit.

There was absolutely nothing to go to the jury unless the Court went behind the action of the Governor, which we think could not be reviewed by the Court. The suspension by the Governor is not a final determination of the defendant's rights, which must ultimately be passed on by the Legislature, sitting somewhat in the nature of a Court of Impeachment. If it should determine that the defendant had been suspended without just cause, he would be at once reinstated, and be entitled to his full pay from the time of his suspension. The duty of suspension was imposed upon the Governor from the highest motives of public policy, to prevent the danger to the public interests which might arise from leaving such great powers and responsibilities in the hands of men legally disqualified. To leave them in full charge of their office until the next biennial session of the Legislature, or pending litigation which might be continued for years, would destroy the very object of the law. As the Governor was therefore by the very letter and spirit of the law required to act and act promptly, necessarily upon his own findings of fact, we are compelled to hold that such official action was, under the circumstances, due process of law. Even if it were proper, the Governor would have no power to direct an issue, like a Chancellor.

Section 19 of Article I of our Constitution provides that:

121—59

"In all controversies at law respecting property, the ancient mode of trial by jury is one of the best securities of the rights of the people and ought to remain sacred and inviolable." And yet from the remotest times it has been held that this right did not apply to equitable proceedings, and that in the determination of many matters of fact the intervention of a jury was neither necessary nor possible. Take for instance, applications for receivers, injunctions and proceedings in contempt. Even in actions at law, there are many matters of fact that must be found by the Court below, and which are not even reviewable in this Court. Every time a Judge below takes the case from the jury and directs a verdict he practically deprives the party of a trial by jury; and yet that he can so direct a verdict against the party on whom rests the *onus*, when there is nothing more than a scintilla of evidence, has been held in a long line of decisions in this Court from *Wittkowsky* v. *Wasson*, 71 N. C., 451, down to *Spruill* v. *Insurance Co.*, 120 N. C., 141, and several cases at this term.

In *Interstate Commerce Commission* v. *Brimson*, 154 U. S., 447, 488, the Court says: "Another suggestion    .    .    .    .    is that the defendants are not accorded a right of trial by jury.    .    .    .    The issue presented is not one of fact but of law exclusively. In such a case the defendant is no more entitled to a jury than is a defendant in a proceeding by mandamus to compel him as an officer to perform a ministerial duty." Any right of trial by jury which the defendant might have had under other circumstances, if any, would be taken as having been waived by his acceptance of an office under a Statute providing for summary suspension. That a jury trial may be waived by either written or oral consent, or even by a failure to appear, is expressly provided by Section 416 of *The Code*. It is also held to be waived by a consent reference. Clark's Code, p. 400 and cases cited. In England it is regarded as

CALDWELL v. WILSON

a prerogative of the Crown by letters patent to suspend a public officer, although the office was granted for life. Throop on Public Officers, Section 401; *Slingsby's Case*, 3 Swanst, 178. The only recognition of this rule in America seems to be that involved in the maxim that the power of appointment includes by implication that of removal, the application of which is necessarily limited by Constitutional or Statutory provision. The maxim cannot apply in this case, because the Governor did not originally appoint and has suspended the defendant under express Statutory authority. It comes rather under the generally recognized rule that, in the absence of any *constitutional* restriction expressed or necessarily implied on the power of the Legislature, it may provide by Statute for the suspension of a public officer, by some other officer or board. Throop, *supra*, Section 402; Mechem on Public Officers, Section 463; *Butler* v. *Penn.*, 10 Howard, 402. With the exception of this State, it is the well settled doctrine in the United States that an office is not regarded as held under a grant or contract, within the general constitutional provision protecting contracts; but, unless the Constitution otherwise expressly provides, the Legislature has power to increase or vary the duties, or diminish the salary or other compensation appurtenant to the office, or abolish any of its rights or privileges before the end of the term, or to alter or abridge the term, or to abolish the office itself. Throop, *supra*, Section 19, citing 92 decisions from the United States Supreme Court and 32 different States; also Black Const. Law, p. 530, and cased cited. Mechem, *supra*, Section 463 and 464, citing numerous cases, says that, except in North Carolina, it is well settled that there is no contract, either express or implied, between a public officer and the government whose agent he is; nor can public office be regarded as the property of the incumbent. In *Connor* v. *N. Y.*, 2 Sandford, 355, Ruggles, C. J.,

says: "Public offices are not incorporeal hereditaments, nor have they the character or qualities of grants. They are agencies. With few exceptions, they are voluntarily taken and may at any time be resigned. They are created for the benefit of the public and are not granted for the incumbent. Their terms are fixed with a view to public utility and convenience, and not for the purpose of granting the emoluments during that period to the office holder."

The celebrated case of *Hoke* v.*Henderson*, 15 N. C., 1, recognizes to a great extent the same principle. While deciding in favor of the defendant on the ground that an office is the property of the incumbent by mutual contract, and that the unconstitutional provision was not that of a law *prescribing* a rule of property, or modifying the extent of interest or the tenure *prospectively*, but interfered with *vested* rights, Chief Justice Ruffin (page 17) says: "That the purpose of creating public offices is the common good, is not doubted. Hence, most of the rules regulating them have a reference to the discharge of their duties and the promotion of the public convenience; they are *pro commodo populi*. Hence they are *not* the subjects of property in the sense of that full and absolute dominion which is recognized in many other things. *They are only the subjects of property, as far as they can be so in safety to the general interest, involved in the discharge of their duties.*" This Court has recently had occasion to reaffirm the doctrine laid down in that oft quoted decision, which has become too firmly established in the policy of our laws now to be questioned; but the varied and extraordinary claims made thereunder, and the fact that we are the only State in the Union recognizing the doctrine, may well cause us to pause and consider if we have not carried it to its fullest ligitimate extent. It may be doubted if the great Chief Justice himself ever contemplated the extent to which it would be carried, and least of all that its most extreme

CALDWELL *v.* WILSON.

construction would be invoked to bring the tenure of high official positions within the operation of an amendment to the Federal constitution primarily adopted for the protection of the colored race. See the opinion of Justice Miller in the *Slaughter House Cases,* 16 Wall. 36.

But our decision in the case at bar does not conflict with that in *Hoke* v. *Henderson.* The Statute now under consideration is not retrospective, and does not interfere with any vested right. Being a part of the Act originally creating the office of Railroad Commissioner, it *"prescribes"* a rule of property in said office, and modifies the extent of interest and tenure therein *"prospectively."* The defendant, taking under the Act, holds subject to the Act; and relying upon his contract is bound by all its provisions. One of its express provisions was the reserved right of the Legislature to remove, and the power and duty of the Governor to suspend under a given state of facts. This power of suspension, together with the necessary method of its enforcement, was assented to by the defendant in his acceptance of the office. *Bunting* v. *Gales,* 77 N. C. 283; *McCless* v. *Meekins,* 117 N. C., 34; *McDonald* v. *Morrow,* 119 N. C., 666; *Ward* v. *Elizabeth City,* 121 N. C.; 27 S. E. Reporter, 993; *Koonce* v. *Russell,* 103 N. C., 179; *Hutchins* v. *Town of Durham,* 118 N. C., 457; Cooley's Const. Limitations, 285. It was held in *Head* v. *University of Missouri,* 19 Wallace, 526, that where one was elected a professor in a State University for six years "subject to law," "this expression meant subject to whatever law the State Legislature might see fit to pass. It was a part of the contract that the Legislature could, at its discretion and in its pleasure, bring it to an earlier end." In *Ewart* v. *Jones,* 116 N. C., 570, which was an action in the nature of a *quo warranto* heard upon a case agreed *without* a jury, this Court in seating the relator, held that under our present Constitution the Legislature had the power, in

establishing the office of Judge of the Criminal Court, to prescribe its powers, jurisdiction and methods of appointment and removal, and to *elect the incumbent.* Chief Justice FAIRCLOTH, in delivering the opinion of the Court says: "Under our form of government the sovereign power resides with the people, and is exercised by their Representatives in the General Assembly. The only limitation upon this power is found in the organic law, as declared by the delegates of the people in convention assembled from time to time." If the Legislature can thus elect a Judge of the Criminal Court and provide for the manner of his removal, why can it not also elect a Railroad Commissioner, and in the creative act reserve to itself the right to remove and to the Governor the power of suspension. Two higher agencies could not be found, one peculiarly representing the will of the people, and the other the Chief Executive of the State to whom is committed by the Constitution itself "the supreme executive power of the State" and who is expressly enjoined "to take care that the laws be faithfully executed." But it is urged that the Legislature has exceeded its constitutional power in reserving the right of removal. We think not, where the office is purely of legislative origin and administrative duties.

It is alleged that the Statute is unconstitutional because it requires of the Railroad Commissioners qualifications in addition to those prescribed in the Constitution. We see no merit in this contention, as such provisions were not intended to restrict the rights of the individual, but to secure the faithful and efficient performance of public duties. *Hargrove* v. *Dunn*, 73 N. C., 395; *Commissioners* v. *Plaisted*, 148 Mass. 375; *Rogers* v. *Buffalo*, 123 N. Y., 173, 181; Throop on Public Officers, Section 73, 74.

Moreover, every presumption is in favor of the constitutionality of an Act of the Legislature, and all reasonable

doubts should be solved in its favor. Cooley on Const. Lim., page 220, and cases therein cited; Black's Const. Law, Section 30 and cited cases.

While our attention has not been called to any decision from other jurisdictions relating to the removal or suspension of Railroad Commissioners, we do find in the creative Statutes of the United States and of several of the States, provisions similar to those now under consideration. The same presumption of constitutionality would attach to them, and thus far they may be considered as precedents. Another constitutional objection to the Act has been argued with great force, and has received our most careful and serious consideration. That objection is that the Act interferes with the independent tenure of the Judiciary so essential to the proper enforcement of the law and the protection of the citizen. This Commission was compared to the Criminal Courts of the State; and the danger of placing the lives and liberties of the people in the keeping of Judges whose official tenure might depend upon the uncertain complexion of the Legislature or the arbitrary will of the Governor, was ably and eloquently portrayed.

We realize the responsibilities of this Court in settling the line of demarkation between the legislative, executive and supreme judicial powers, which, by constitutional obligation, must be kept forever separate and distinct. This vital line must be drawn by us alone, and we will endeavor to draw it with a firm and even hand, free alike from the palsied touch of interest or subserviency and the itching grasp of power. Should the legislative or executive departments of the State cross that line, we will put them back where they belong; but upon us rests the equal obligation of keeping upon our own side. This is a question not of discretion but of law, a matter not of expediency but of right.

Our conclusion is that the Railroad Commission does not stand upon the same footing as the Criminal Courts, inasmuch as it is an *administrative* and not a *Judicial* Court. While it was made by a subsequent Statute a court of record, it was clearly the object of the Act simply to give authenticity to its records and proceedings, as it added nothing to its duties or powers.

It has been held to be a court of record in *Express Co.* v. *Railroad*, 111 N. C., 463, 474, but in the opinion of the Court delivered by Chief Justice Shepherd appears the significient qualification, "Whether a Court, having no power to enforce its judgment, fulfills the definition of a court of record and of general jurisdiction is *unnecessary to be considered.*" The Supreme Court of the United States in *Reagan* v. *Farmer's Loan & Trust Co.*, 154 U. S., 362, 397, citing the *Railroad Commissioner cases*, 116 U. S., 307, says: "There can be no doubt of the general power of a State to regulate the fares and freights which may be charged and received by Railroads or other carriers, and that this regulation can be carried on by means of a commission. Such a Commission is merely an *administrative* board created by the State for carrying into effect the will of the State as expressed by its Legislature."

Upon the foregoing authorities we are of opinion that the disputed provisions of the Act are constitutional, and that the power of suspension rests in the hands of the Governor, which, when exercised in an orderly manner, is not reviewable by the Courts. Whether the action of the Governor was justified by the facts, which he alone could find, is not for us to say. That the defendant has not been deprived of his property without due process of law; that the only property he could have in the office was that given to him by the Statute, which must be construed in all its parts. His Commission, which is his title deed, appears to us with the fateful words of the creative

Act written across its face by the hand of the law. Whatever right to a trial by jury he might otherwise have had, was waived by his acceptance of the office under the conditions of the Statute, at least so far as the action of the Governor was concerned. In the Court below, as all the material facts that could there be inquired into were practically admitted, there was nothing left but the bare questions of law, and upon those questions we see no error in the ruling of the Court. The judgment must therefore be affirmed, but in view of the public interests involved, we deem it proper, not to remand the case, but to enter final judgment in this Court. This action is taken on motion of counsel made without objection in open Court upon the hearing of the case, and under authority of Section 957 of *The Code*, as recognized in *Bernhardt* v. *Brown*, 118 N. C., 700, 710. Judgment will therefore be entered that the relator is entitled to the office of Railroad Commissioner and Chairman of said Commission; that the defendant is not entitled thereto and shall be ousted therefrom, and that the relator be placed into possession of said office, together with all its records and other appurtenances thereunto belonging.

Affirmed.

The judgment in the foregoing case was as follows:

"This cause coming on to be heard in the Supreme Court and having been decided in favor of the plaintiff, it is adjudged and decreed:

1. That the defendant has been lawfully suspended from the office of Railroad Commissioner.

2. That the relator has been duly appointed to fill the vacancy caused by the suspension of the defendant.

3. That the defendant be ousted from, and the relator inducted into said office of Railroad Commissioner.

Therefore, let a writ issue out of this Court directed to the Sheriff or other lawful officer of Wake County, commanding

CALDWELL *v.* WILSON.

him to oust the defendant and put the relator in possession of the rooms occupied as offices by the Railroad Commissioners, in the Agricultural Building on Edenton Street in Raleigh, and known as the Railroad Commission offices, together with all property, papers and effects appertaining or belonging to said offices.

4. That the plaintiff relator recover the costs of this action to be taxed by the Clerk of this Court.

(Signed) WALTER CLARK,<br>Justice Supreme Court."

FAIRCLOTH, C. J., dissenting: As I do not agree with the majority of the Court in this case, I feel it my duty to state why I do not. I concede the right of the Legislature to abolish any office of its own creation, in which event the officer goes with the office, not upon any notion of implied notice in the acceptance, but because the Legislature has the power to abolish. By the Act of 1891, Chapter 320, the Legislature created the office of a Railroad Commission with the powers and duties therein enumerated, and elected the members of the Commission, the term of office being six years. That said Commission is a Court of Record with the powers and jurisdiction of a Court of general jurisdiction, to the extent of all subjects embraced in said Act, is settled. *Express Co. v. Railroad,* 111 N. C., 463; *Railroad* v. *Telegraph Co.* 113 N. C., 213; *Learvell* v. *Telegraph Co.,* 116 N. C., 211. That an office is property has been uniformly held since 1833. *Hoke* v. *Henderson,* 15 N. C., 1. Section 1 of said Act provides: "Said Commissioners shall not jointly, or severally, or in any way be the holder of any stock or bonds, or be the agent or attorney or employee of any such company, or have any interest in any way in such company, and shall so continue during the term of his office, and in case any Commissioner shall, as distributee or legatee or in any other

way, have or become entitled to any stock or bonds or interest therein of any such company, he shall at once dispose of the same; and in case any Commissioner shall fail in this, or in case any one of them shall become disqualified to act, then it shall be the duty of the Governor to suspend him from office and to report the fact of his suspension, together with the reason therefor, to the next General Assembly, and the question of his removal from office shall be determined by a majority of the General Assembly in joint session.    In any case of suspension the Governor shall fill the vacancy, and, if the General Assembly shall determine that the Commissioner suspended shall be removed, then the appointee of the Governor shall hold until his successor is elected and qualified as hereinbefore provided, &c."

Thus we see that the Governor *suspends* whenever he deems proper and the Legislature *removes* at its will and pleasure, as an *ex parte* proceeding, the officer (commissioner) having no opportunity to be heard.    This proceeding is at least a novelty and so far as I remember is without precedent, certainly so in North Carolina.    Such proceedings no doubt are found under some forms of government, but they are at variance with all fundamental rules of government in the United States of America.    Those rules protect life, liberty and property in the due administration of law.

My conception is that the act of the Governor in suspending the defendant was not an executive function, but simply the act of an agent of the Legislature with such power as they attempted to confer on their agent, and that the term "Governor" was simply used to identify the agent.    I can see no reason why the Secretary of State could not as well have been the agent, with directions, for the causes mentioned in the Act, to suspend the Governor from his office until the Legislature should have an opportunity to remove or restore him, as they might choose to do, without any hearing for him.    If this can be done for the causes specified in Section 1 of the

Act, then other like causes might be added. Let us then suppose that the Legislature in addition, had said "if the Governor shall own any stock in any railroad in this State, or shall receive any benefit, convenience or accommodation from any railroad, then the Secretary of State shall suspend him from office, and report his Act to the next Legislature, and that they will remove or restore him, as seems good to them." It seems to me that such action would be in derogation of his rights under Article III, Section 12 and Article IV, Section 3 and 4 of the Constitution, providing for his conviction, removal and disqualification for office. It is true that he is a constitutional officer, and so is the defendant, under the authority of Article IV, Section 2.

So, the real question is the power of the Legislature to suspend and remove a judicial officer from his office and thus forfeit his property without giving him a trial.

Under our form of government the source of all power is the people. At the outset they declared their will in the Constitution and adopted by common consent, general rules for governing themselves, known as the law of the land, and each Department, with its many sub-divisions, is subordinate to those fundamental principles. The Constitution is a brief and condensed expression of law and must be taken as expressed, with all of its reasonable implications· Among its utterances we find: "The legislative, executive and supreme judicial powers of the government ought to be forever separate and distinct from each other." Article I, Section 8.

"The Executive Department shall consist of a Governor, in whom shall be vested the Supreme Executive power of the State," &c. Article III, Section 1.

"The judicial power of the State shall be vested in a Court for the trial of impeachments, a Supreme Court, Superior Courts, Courts of Justices of the Peace and such other Courts

inferior to the Supreme Court, as may be established by law." Article IV, Section 2.

"The General Assembly shall have no power to deprive the judicial department of any power or jurisdiction which rightly pertains to it as a co-ordinate department of the government." Article IV, Section 12. And this article provides further that the Legislature may distribute the power and jurisdiction, provide for appeals, and regulate the method of proceeding, as it may deem best, "so far as the same may be done without conflict with other provisions of this Constitution." "No person ought to be taken, imprisoned or disseized of his freehold, liberties or privileges, or outlawed or exiled or in any manner deprived of his life, liberty, or *property*, but by the law of the land." Article I, Section 17.

"In all controversies at law respecting property, the ancient mode of trial by jury is one of the best securities of the rights of the people, and ought to remain sacred and inviolable." Article I, Section 19.

The terms "due process of law" and "the law of the land" when the rights of property are under consideration, are not easily distinguished. I have seen no better definition of the latter than that given by Mr. Webster in *Dartmouth College* v. *Woodward,* 4 Wheat, 519, (Works of Webster Vol. V, p. 487). "By the law of the land is most clearly intended the general law; a law which hears before it condemns; which proceeds upon inquiry, and renders judgment only after trial. The meaning is that every citizen shall hold his life, liberty, property and immunities, under the protection of the general rules which govern society. Everything which may pass under the form of an enactment is not, therefore, to be considered the law of the land. If this were so, acts of attainder, bills of pains and penalties, acts of confiscation, acts reversing judgments, and acts directly transferring one

man's estate to another, legislative judgments, decrees and forfeitures in all possible forms, would be the law of the land. Such a strange construction would render constitutional provisions of the highest importance completely inoperative and void. It would tend directly to establish the union of all powers in the Legislature. There would be no general permanent law for Courts to administer or men to live under. The administration of justice would be an empty form, an idle ceremony. Judges would sit to execute legislative judgments and decrees, not to declare the law or administer the justice of the country."

A glance at the above recitals would seem to answer, without further argument, the question "Has the Legislature the power, directly or indirectly, to suspend or remove a judicial officer, and declare his right and property in his office forfeited?"

It has been universally held in this country, wherever *freemen* live, that no forfeiture of an office nor vacancy therein can be judicially declared, until the accused has had a trial and sufficient cause is established. *Hoke* v. *Henderson*, 15 N. C., 1; *People* v. *Heaton*, 77 N. C., 18; *Vann* v. *Pipkin*, 77 N. C., 408; *State* v. *Norman*, 82 N. C., 687.

"The term 'law of the land' does not mean merely an act of the General Assembly. If it did every restriction upon the legislative authority would be at once abrogated." *Hoke* v. *Henderson, supra.*

Suppose the General Assembly at its next meeting shall examine the Governor's report and, finding no sufficient cause, shall *adjudge* that defendant was not duly suspended and that he has not forfeited his office, and the plaintiff shall refuse to surrender his possession of the office; what then? With these conflicting decisions, to what tribunal can the parties appeal for a finality? Any legislative Act that *can* lead to such a result must be a nullity. Any legislative

sentence declaring a forfeiture of property is judicial in its nature and, when rendered without a hearing and trial, is in the nature of things void. The Constitutionality of an Act is determined by its effect, rather than the intent of the Legislature. *Bank Tax Case*, 2 Wallace, 200; *Provident Insurance Co.* v. *Massachusetts*, 6 Wallace, 611. It may be competent, as I have said, to abolish an office, when the property therein is necessarily lost, but it is quite a different proposition to continue the office, discharge the officer at pleasure, and give his office to another. I am told that every office is accepted with notice that the officer may be displaced or removed. That is not an express condition, but at most is only an implied condition, and it is equally implied that such removal, when personal and property rights have vested, can be made, only after *cause* established, by a Court having jurisdiction and by proceedings recognized by the general and fundamental rules of law and by judicial authority. Conditions precedent may bar an entry, but a condition subsequent, even if it be illegal or immoral, cannot divest an estate. A subsequent condition is not self-executing, and when invoked for the purpose of convicting and declaring a forfeiture, it becomes effective only under the rule and the manner above stated.

There is no allegation of incompetency, bad faith or *mal*-administration against the defendant in the discharge of his duties in office. The matters preferred by the Governor in his suspending order, rather vaguely stated and based upon private information and newspaper reports, are inserted in the complaint and substantially constitute the complaint. The defendant specifically denies each material allegation. When brought before the Superior Court under the form of a trial, the defendant demanded to hear the proof of the matters alleged, to confront his accusers, to cross-examine, to introduce his own evidence, and to have the issues de-

termined by a jury of his peers. These requests were all refused by the Court and judgment was pronounced declaring that defendant had been duly suspended from his office, and ordering his ouster therefrom. This Court is now appealed to, to affirm said judgment and approve the procedure below in this case.

Without exhausting the argument, my excuse for tediousness is the importance of this question. I think the plaintiff's contention is injurious, subversive and contrary to the organic law of our system of government, and that it is unreasonable and unjust, and that the decisions of any Court in any State, disregarding those principles, must soon fall under the condemnation of the legal mind in this country.